Filed 8/29/18

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| ENVIRONMENTAL LAW FOUNDATION et al., | C083239 |
| Plaintiffs and Respondents, | (Super. Ct. No. 34201080000583) |
| v. | |
| STATE WATER RESOURCES CONTROL BOARD, | |
| Defendant, Cross-defendant and Respondent; | |
| COUNTY OF SISKIYOU, | |
| Defendant, Cross-complainant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Christopher E. Krueger, Judge. Affirmed.

James M. Underwood, Interim County Counsel and Natalie E. Reed, Assistant County Counsel; Best Best & Krieger and Roderick E. Walston for Defendant, Cross-complainant and Appellant.

1

Downey Brand, Christian L. Marsh, Arielle O. Harris and Austin C. Cho for California State Association of Counties, California Association of Sanitation Agencies and League of California Cities as Amici Curiae on behalf of Defendant, Cross-complainant and Appellant.

Damien M. Schiff and Jeremy Talcott for Pacific Legal Foundation and California Farm Bureau Federation as Amici Curiae on behalf of Defendant, Cross-complainant and Appellant.

Briscoe Ivester & Bazel, John Briscoe and Lauren Bernadett for Association of California Water Agencies as Amicus Curiae on behalf of Defendant, Cross-complainant and Appellant.

James Wheaton and Lowell Chow; Glen H. Spain; UC Davis School of Law and Richard M. Frank for Plaintiffs and Respondents.

Xavier Becerra, Attorney General, Robert W. Bryne, Assistant Attorney General, Tracy L. Winsor, Daniel M. Fuchs, Allison E. Goldsmith and Mark W. Poole, Deputy Attorneys General, for Defendant, Cross-defendant and Respondent.

This appeal presents two important questions involving the application of the public trust doctrine to groundwater extraction—whether the doctrine has ever applied to groundwater and, if so, whether the 2014 Sustainable Groundwater Management Act (SGMA) abrogated whatever application it might have had, replacing it with statutory rules fashioned by the Legislature.  We are invited to opine on these questions in the absence of a specific and concrete allegation that any action or forbearance to act by the State Water Resources Control Board (Board) or permit issued by County of Siskiyou (County) to extract groundwater actually violated the public trust doctrine by damaging the water resources held in trust for the public by the Board or the County.  Rather, the Environmental Law Foundation and associated fishery organizations Pacific Coast Federation of Fishermen's Association and Institute for Fisheries Resources (collectively ELF), the Board, and the County amicably solicit our opinion as to whether the public trust doctrine giveth the Board and the County a public trust duty to consider whether the

2

extractions of groundwater adversely affect public trust uses of the Scott River and whether SGMA taketh those duties away. (Wat. Code, § 10720 et seq.)[1]

Concerned that the parties had merely solicited an advisory opinion, we asked them to brief the threshold question whether the case is justiciable. In its tentative ruling, the trial court too had found declaratory relief was not available because there was no real controversy between the parties. The parties, including amici curiae, urge us as they did the trial court, to address what they characterize as an issue of great public importance. The trial court acquiesced because "[i]f the issue of justiciability is in doubt, it should be resolved in favor of justiciability in cases of great public interest." (*National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 432, fn. 14 (*National Audubon*).) We agree with the trial court and will consider the case on the merits.

But the supplemental briefing also illuminates the narrowness of the issues before us. We are asked to determine whether the County and the Board have common law fiduciary duties to consider the potential adverse impact of groundwater extraction on the Scott River, a public trust resource, when issuing well permits and if so, whether SGMA on its face obliterates that duty. There are no challenges to any specific action or failure to act by the County or the Board in betrayal of their duties to protect the Scott River. Thus, while the issue may have significant importance to the public and its fiduciaries, any potential transgressions remain abstractions.[2]

---

[1] Further undesignated statutory references are to the Water Code.

[2] As the trial court pointed out, "The present motions concern only the existence, *vel non,* of the Board's authority and duty under the public trust doctrine to take *some* action regarding groundwater extractions, where those extractions harm public trust uses in public trust waters. Precisely *what* that action would be is an issue that is left for another day."

In a similar vein, the County cites a new case assertedly in support of its argument that it lacks discretion to administer the public trust. But *California Water Impact Network v.*

The scope of our ruling in this context, therefore, is extraordinarily narrow. We eschew consideration of any hypothetical factual scenarios and will not attempt to define the common law public trust duties of the Board or the County in light of how SGMA is actually implemented. The parties insist this seeks only to determine whether the enactment of SGMA, without more, abolishes or fulfills the common law duty to consider the public trust interests before allowing groundwater extraction that potentially harms a navigable waterway. We need not, and do not, opine on a host of arguments that go beyond the limited scope of the two dispositive issues framed above.[3]

*County of San Luis Obispo* (2018) 25 Cal.App.5th 666, is a California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) case, not a case involving the public trust doctrine. Whether approval of well permits are ministerial acts exempt from CEQA bears no relevance to the important questions involving the public trust doctrine and groundwater raised in this case.

[3] Amici curiae Pacific Legal Foundation and the California Farm Bureau Federation raise a host of issues, including unlawful takings that are not ripe for our consideration. " 'Amicus curiae must accept the issues made and propositions urged by the appealing parties, and any additional questions presented in a brief filed by an amicus curiae will not be considered.' " (*Pratt v. Coast Trucking, Inc*. (1964) 228 Cal.App.2d 139, 143, quoting *Eggert v. Pacific States S. & L. Co.* (1943) 57 Cal.App.2d 239, 251; see also, *Bialo v. Western Mutual Ins. Co.* (2002) 95 Cal.App.4th 68, 73-74.)

Echoing the need for a narrow ruling, amicus Association of California Water Agencies points out the Scott River has received unique attention from the Legislature. "The Legislature finds and declares that by reasons of the geology and hydrology of the Scott River, it is necessary to include interconnected ground waters in any determination of the rights to the water of the Scott River as a foundation for a fair and effective judgment of such rights, and that it is necessary that the provisions of this section apply to the Scott River only." (§ 2500.5, subd. (d).) While we acknowledge the limited scope of our review, dictated as it must be by only those issues that are ripe for review and raised by the parties, we do not base our decision on the special legislation pertaining to the Scott River. The fact that the Scott River stream system includes groundwater interconnected with the Scott River may exacerbate the adverse impacts on the public trust but the legal issue is whether the state has a fiduciary duty to consider any adverse impacts when groundwater extraction harms a navigable waterway.

FACTS

We need not recite the procedural journey since this case began in 2009 because the parties ultimately stipulated to 11 undisputed material facts and ELF dismissed its claim for injunctive relief. All that is left of the initial complaint is ELF's request for declaratory relief. The County's second amended cross-complaint against the Board is similarly confined to declaratory relief. The trial court resolved the questions of law at issue here in three steps: (1) granting a partial judgment on the pleadings in July 2014; (2) denying the County's motion for reconsideration in April 2015; and (3) granting ELF's motion for summary judgment and denying the County's cross-motion for summary judgment in August 2016. We begin with the pertinent stipulated facts and end with a summary of the trial court's legal conclusions. Our review is de novo. (*People ex rel. Harris v. Pac Anchor Transportation, Inc.* (2014) 59 Cal.4th 772, 777; *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767.)

The subject of the public trust is the Scott River in Siskiyou County, a tributary of the Klamath River and a navigable waterway for the purposes of the public trust doctrine. This case does not involve any of the water or water rights previously adjudicated in the Scott River Decree in 1980. The Scott River Decree does not adjudicate groundwater extractions from wells outside the geographical area covered by the decree. Yet pumping of interconnected groundwater in the Scott River system that has an effect on surface flows is occurring outside of the geographical area covered by the decree. The County established a permit program for the construction standards for new wells and a groundwater management program that regulates the extraction of groundwater for use outside the basin from which it is extracted.

ELF and the County filed cross-motions for partial judgment on the pleadings as to the four affirmative defenses raised by the County. In granting ELF's partial judgment on the pleadings, the court made important findings. "[T]he public trust doctrine protects the Scott River and the public's right to use the Scott River for trust purposes, including

fishing, rafting and boating. It also protects the public's right to use, enjoy and preserve the Scott River in its natural state and as a habitat for fish. [Citation.] If the extraction of groundwater near the Scott River adversely affects those rights, the public trust doctrine applies."

The court also ruled on arguments "directed at [ELF's] request for injunctive and writ relief, and concern[ing] the County's duty, if any, under the public trust doctrine." In this context, the court ruled: (1) section 10750 et seq. concerning groundwater management plans "does not subsume the public trust doctrine, rendering it inapplicable to groundwater;" (2) "[T]here is no conflict between authorizing the County to adopt a groundwater management plan, and requiring it to comply with the public trust doctrine," and therefore "[i]f the County's issuance of well permits will result in extraction of groundwater adversely affecting the public's right to use the Scott River for trust purposes, the County must take the public trust into consideration and protect public trust uses when feasible;" (3) "As a subdivision of the State, the County 'shares responsibility' for administering the public trust" and has a public trust duty to consider the impacts of new wells on public trust uses in the Scott River, when it issues permits for construction of the wells; (4) there is no violation of the separation of powers; and (5) the Scott River Decree does not preclude the application of the public trust doctrine to Scott River groundwater, because ELF alleges that the public trust doctrine applies only to groundwater outside the area of adjudication.

Initially, the trial court did not decide whether the Board had authority to regulate the groundwater under the public trust doctrine because "neither motion for judgment on the pleadings is brought by, or asserted against, the Board." The County filed a cross-complaint against the Board alleging that the Board is not authorized to regulate groundwater under the public trust doctrine.

After the proceedings on the motions for judgment on the pleadings, the Legislature enacted SGMA, a system of groundwater regulation in California to take

6

effect in varying stages over the next decade regarding designated groundwater basins. (Stats. 2014, Ch. 346, § 3; see, e.g., §§ 10720.7, subd. (a), 10735.8, subd. (h).) The County asked the trial court to reconsider its order in light of the new legislation. The court denied the County's motion, finding that the Legislature did not intend to supplant the common law but to the contrary, "rather than stating SGMA supplants the common law, the Legislature went out of its way to state that SGMA supplements and does not alter the common law." The court explained further that there is no sound reason why the Supreme Court's holding in *National Audubon, supra*, 33 Cal.3d at p. 445 "about the relationship between the appropriative water rights system and the public trust doctrine would not apply equally to the relationship between SGMA and the public trust doctrine – they coexist and neither occupies the field to the exclusion of the other."

Anxious to avoid trial and expedite an appeal, the parties entered into an extensive stipulation about further proceedings and withdrew all of their claims but for the request for declaratory relief on the questions of law resolved in the motions for judgment on the pleadings, the motion for reconsideration, and ultimately on the cross-motions for summary judgment. As mentioned, the parties also filed a statement of undisputed material facts and agreed "that any factual issues not included in the Stipulation of Undisputed Facts are not raised in this litigation, and are not relevant to the issues raised in this litigation."

The parties agreed the court had decided the following questions of law:

"1. The public trust doctrine applies to extraction of groundwater from the Scott River system, to the extent that such extraction of groundwater affects public trust resources and uses in the Scott River.

"2. The County, in issuing permits for wells that would result in extraction of groundwater has a public trust duty to consider whether the wells will affect public trust resources and uses in the Scott River.

7

"3.  The Groundwater Management Act, Water Code sections 10750 *et seq.*, does not conflict with the County's public trust duty as described in Paragraph V(A)(2) above.

"4.  The Sustainable Groundwater Management Act ("SGMA"), Water Code sections 17320 [*sic*] *et seq.*, which was enacted by the Legislature in 2014, does not conflict with the County's public trust duty as described in Paragraph V(A)(2) above.

"5.  The Scott River Decree of 1980 does not alter the County's public trust duty as described in Paragraph V(A)(2) above."

The cross-motions for summary judgment presented one legal issue:  whether the Board has the authority and duty under the public trust doctrine to regulate extractions of groundwater that affect public trust uses in the Scott River.  The trial court granted summary judgment in favor of ELF and the Board and against the County.  The court explained:  "The Water Code as a whole, as construed by the courts, 'vest[s] in the Board broad adjudicatory and regulatory power and suggest the Board's regulatory authority is coincident with that of the Legislature.'  [Citation.]  Given the Board's broad authority to administer the State's water resources, it is but a short step to the conclusion that the Board has the authority to administer the public trust on behalf of the State.  In other words, assuming the public trust doctrine is applicable to the facts alleged in this case, the Board is the logical entity to exercise the State's authority and obligations thereunder. Simply put, if not the Board, then who?"

On appeal, the County contends the Board has neither the authority nor the duty to consider how the use of groundwater affects the public trust in the Scott River; nor does the County have a public trust duty to consider whether groundwater uses by new wells affect public trust uses in the Scott River.  Several amici add their voices to the merits of the appeal.[4]

---

[4]  The parties filing amicus curiae briefs are:  California State Association of Counties, California Association of Sanitation Agencies and League of California Cities; Pacific

8

**DISCUSSION**

**I**

*Does the public trust doctrine apply to the extraction of groundwater that adversely impacts a navigable waterway?*

From ancient Roman roots, the English common law has developed a doctrine enshrining humanity's entitlement to air and water as a public trust.[5]  The public trust doctrine rests on several related concepts.  "First, that the public rights of commerce, navigation, fishery, and recreation are so intrinsically important and vital to free citizens that their unfettered availability to all is essential in a democratic society.  [Citation.]  'An allied principle holds that certain interests are so particularly the gifts of nature's bounty that they ought to be reserved for the whole of the populace. . . . [¶] Finally, there is often a recognition, albeit one that has been irregularly perceived in legal doctrine, that certain uses have a peculiarly public nature that makes their adaptation to private use inappropriate.  The best known example is found in the rule of water law that one does not own a property right in water in the same way he owns his watch or his shoes, but that he owns only a usufruct—an interest that incorporates the needs of others.  It is thus thought to be incumbent upon the government to regulate water uses for the general benefit of the community and to take account thereby of the public nature and the interdependency which the physical quality of the resource implies.'  [Citation.]" (*Zack's, Inc. v. City of Sausalito* (2008) 165 Cal.App.4th 1163, 1175-1176.)

In a then shocking renunciation of the fee title to the submerged lands in the harbor of Chicago the State of Illinois had transferred to a railroad, the United States

---

Legal Foundation and California Farm Bureau Federation; and Association of California Water Agencies.

[5]  " 'By the law of nature these things are common to mankind – the air, running water, the sea and consequently the shores of the sea.'  (Institutes of Justinian 2.1.1.)"  (*National Audubon, supra*, 33 Cal.3d at pp. 433-434.)

Supreme Court in 1892 first enunciated the sanctity of a public trust over navigable waterways. *Illinois Central Railroad v. Illinois* (1892) 146 U.S. 387 [13 S.Ct. 110] (*Illinois Central*), established that "the title which a State holds to land under navigable waters is . . . held in trust for the people of the State, in order that they may enjoy the navigation of the waters and carry on commerce over them, free from obstruction or interference by private parties; that this trust devolving upon the State in the public interest is one which cannot be relinquished by a transfer of the property; that a State can no more abdicate its trust over such property, in which the whole people are interested, so as to leave it under the control of private parties, than it can abdicate its police powers in the administration of government and the preservation of the peace; and that the trust under which such lands are held is governmental so that they cannot be alienated, except to be used for the improvement of the public use in them." (*Long Sault Development Co. v. Call* (1916) 242 U.S. 272, 278-279 [37 S.Ct. 79].)

*Illinois Central* remains the seminal case on the public trust doctrine. (*San Francisco Baykeeper, Inc. v. State Lands Com.* (2015) 242 Cal.App.4th 202, 234 (*Baykeeper*).) The case instructs courts to " 'look with considerable skepticism upon *any* governmental conduct which is calculated *either* to reallocate that resource to more restricted uses *or* to subject public uses to the self-interest of private parties.' [Citation.]" (*Zack's, Inc. v. City of Sausalito, supra*, 165 Cal.App.4th at p. 1176.)

The doctrine is expansive. (*Colberg, Inc. v. State of California ex rel. Dept. Pub. Wks.* (1967) 67 Cal.2d 408, 416-417.) "The range of public trust uses is broad, encompassing not just navigation, commerce, and fishing, but also the public right to hunt, bathe or swim. [Citation.] Furthermore, the concept of a public use is flexible, accommodating changing public needs. [Citation.] For example, an increasingly important public use is the preservation of trust lands ' "in their natural state, so that they may serve as ecological units for scientific study, as open space, and as environments which provide food and habitat for birds and marine life, and which favorably affect the

10

scenery and climate of the area." [Citation.]' [Citation.]" (*Baykeeper, supra*, 242 Cal.App.4th at p. 233.)

Moreover, the public trust doctrine is more than a state's raw power to act; it imposes an affirmative duty on the state to act on behalf of the people to protect their interest in navigable water. As our Supreme Court has mandated: "[T]he public trust is more than an affirmation of state power to use public property for public purposes. It is an affirmation of the duty of the state to protect the people's common heritage of streams, lakes, marshlands and tidelands, surrendering that right of protection only in rare cases when the abandonment of that right is consistent with the purposes of the trust." (*National Audubon, supra*, 33 Cal.3d at p. 441.)

What *Illinois Central* was on the national level in the nineteenth century, *National Audubon* was to California in the twentieth century—a monumental decision enforcing, indeed expanding, the right of the public to benefit from state-owned navigable waterways and the duty of the state to protect the public's "common heritage" in its water. We reject the County's effort to diminish the importance of the opinion, including its mistaken labeling of its central holdings as dicta.[6] To the contrary, *National Audubon* is binding precedent, factually analogous, precisely on point, and indeed dispositive of the threshold question in this appeal: does the public trust doctrine apply to the extraction of groundwater that adversely impacts the Scott River, a navigable waterway?

We begin with the extraordinary collision of values exposed in *National Audubon*. The Department of Water and Power of the City of Los Angeles (DWP), pursuant to a

---

[6] We reject any notion that the Supreme Court's discussion of the public trust doctrine in *National Audubon* was mere dicta. To the contrary, the discussion was essential to the decision. We agree with ELF that the public trust doctrine's relationship to the regulation of water was literally the substantive question before the court. "Statements by appellate courts 'responsive to the issues on appeal and . . . intended to guide the parties and the trial court in resolving the matter following . . . remand' are not dicta." (*Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1158.)

permit issued by the Division of Water Resources, the predecessor to the Board, diverted water from nonnavigable tributaries that would have otherwise flowed into Mono Lake. (*National Audubon, supra*, 33 Cal.3d at p. 424.) The diversion of the water caused the level of the lake to drop, thereby imperiling its scenic beauty and ecological value. (*Id.* at pp. 424-425.) The permit was issued under the appropriative water rights system, a system that dominated California water law since the gold rush (*id.* at p. 442) and was formally enshrined in statute with the enactment in 1913 of the Water Commission Act. (*People v. Shirokow* (1980) 26 Cal.3d 301, 308.) In *National Audubon*, the values undergirding that legislative mandate collided with those that had been, until then, embodied but ignored in the public trust doctrine. (*National Audubon, supra*, at p. 445.)

The Supreme Court captured the intensity of the drama involved in the high stakes contest between the two distinct systems of legal thought. The court wrote: "They meet in a unique and dramatic setting which highlights the clash of values. Mono Lake is a scenic and ecological treasure of national significance, imperiled by continued diversions of water; yet, the need of Los Angeles for water is apparent, its reliance on rights granted by the board evident, the cost of curtailing diversions substantial." (*National Audubon, supra*, 33 Cal.3d at p. 425.) Despite the historical significance of appropriative water rights in the state, the comprehensiveness of the water rights system, the threat to the water supply for the City of Los Angeles, and perhaps, most significantly, the fact that the tributaries from which the water was being diverted were not themselves navigable, the public trust prevailed. Yet the County would have us now dilute or ignore the trust for far less compelling reasons.

Pointing out that groundwater is not navigable, the County insists that it should not be subject to the public trust doctrine, reminding us that no court has held that groundwater is a public trust resource. But the trial court did not find the public trust doctrine embraces all groundwater. To the contrary, the water subject to the trust is the Scott River, a navigable waterway. "[T]he court does not hold the public trust doctrine

12

applies to groundwater itself. Rather, the public trust doctrine applies if extraction of groundwater adversely impacts a navigable waterway to which the public trust doctrine does apply."

Thus, the trial court's finding is unremarkable and well supported by the facts and logic of *National Audubon* and the precedent upon which it relies. The most notable similarity between this case and *National Audubon* is the fact that nonnavigable water was diverted or extracted. In *National Audubon*, the diversion of nonnavigable tributaries had a deleterious effect on Mono Lake, a navigable waterway. (*National Audubon, supra*, 33 Cal.3d at pp 424-425.) Similarly, ELF alleges in this case that the extraction of groundwater potentially will adversely impact the Scott River, also a navigable waterway. The fact the tributaries themselves were not navigable did not dissuade the Supreme Court from concluding the public trust doctrine protects the navigable water (Mono Lake) from harm by diversion of nonnavigable tributaries. (*Id*. at p. 437.) Nor does the fact that nonnavigable groundwater rather than nonnavigable tributaries is at issue here dissuade us where, in both cases, it is alleged the removal of water will have an adverse impact on navigable water clearly within the public trust.

Thus, the pivotal fact is not whether water is diverted or extracted or the fact that it is water itself adversely impacting the water within the public trust. Rather, the determinative fact is the impact of the activity on the public trust resource. Indeed, the Supreme Court in *National Audubon* highlighted an illustrative early case. In *People v. Gold Run D. & M. Co.* (1884) 66 Cal. 138 (*Gold Run*), the state utilizing the public trust doctrine enjoined a mining company from dumping sand and gravel into an nonnavigable stream that flowed into the navigable Sacramento River, because the dumping raised the bed of the Sacramento River impairing navigation. (*National Audubon, supra*, 33 Cal.3d at p. 436.) Focusing on whether the activity had deleterious impacts on navigable waterways, the Supreme Court concluded: " 'If the public trust doctrine applies to constrain *fills* which destroy navigation and other public trust uses in navigable waters, it

13

should equally apply to constrain the *extraction* of water that destroys navigation and other public interests. Both actions result in the same damage to the public trust.' " (*Id.* at pp. 436-437.)

The County's squabble over the distinction between diversion and extraction is, therefore, irrelevant. The analysis begins and ends with whether the challenged activity harms a navigable waterway and thereby violates the public trust. The fact that in this case it is groundwater that is extracted, in *National Audubon* it was nonnavigable tributaries that were diverted, and in *Gold Run* it was sand and gravel that was dumped, is not determinative. Each and every one of these activities negatively impacted a navigable waterway. As a consequence, the dispositive issue is not the source of the activity, or whether the water that is diverted or extracted is itself subject to the public trust, but whether the challenged activity allegedly harms a navigable waterway.

The authority provided by the County does not persuade us otherwise. The County cites *Santa Teresa Citizen Action Group v. City of San Jose* (2003) 114 Cal.App.4th 689 for the bold assertion that the public trust doctrine does not apply to groundwater, ignoring, as we explained above, the crucial detail that the trial court did not find the public trust doctrine applies to groundwater. But more importantly, *Santa Teresa* is not on point because there was no evidence in that case of any negative impact on the surface water body and, therefore, no showing of a harmful impact on public trust resources. Here, the issue is not about protecting public trust uses in groundwater, but about protecting the public trust uses of the Scott River that are at risk of being impaired due to groundwater pumping of contributory flows.

*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459 (*EPIC*) is equally inapposite. *EPIC* is not a water case. At issue in *EPIC* is the public trust in wildlife, which is primarily statutory, unlike the public trust in water, which is based on common law. Moreover, the County misrepresents the court's holding. The County argues that "*EPIC* held that the 'common

14

law' public trust doctrine does not apply in defining an agency's regulatory duties where the Legislature has enacted a statute defining the agency's duties." But the case did not hold that the state's wildlife protection statutes supersede the common law public trust doctrine regarding water or fish; it merely held that the Department of Forestry and Fire Protection's statutory duty to comply with wildlife protection statutes should not be equated with a public trust duty. (*Id.* at pp. 515-516.) Thus, we agree with the Attorney General that since *EPIC* addressed only the statutory (and not the common law) public trust in nonaquatic wildlife, nothing in the Supreme Court's opinion suggests that the Department of Forestry and Fire Protection's statutory responsibilities displaced or superseded any of its responsibilities under the common law public trust doctrine in water resources; nor is there any indication the court sought to merge the two doctrines.

Amici accuse the trial court of confusing a municipality's authority to adopt an ordinance or regulatory system under its police power with its public trust authority. The parties do not challenge the County's police powers. (See, e.g. *Allegretti & Co. v. County of Imperial* (2006) 138 Cal.App.4th 1261, 1283; *Baldwin v. County of Tehama* (1994) 31 Cal.App.4th 166, 173-174.) The trial court properly addressed the very different question of whether the public trust doctrine imposes a fiduciary duty on the County. There is no allegation here the County overstepped the scope of its public power and any issue outside the public trust doctrine is not before this court.

*National Audubon* and its progeny recognize that government has a duty to consider the public trust interest when making decisions impacting water that is imbued with the public trust. The County raises two additional objections to imposition of the duty to consider the public's inherent interest in its navigable waterways. First, the County insists that the constitutional imperative compelling the reasonable use of water subsumes any parallel duty under the public trust doctrine. And, secondly, the County rejects the notion that any duty imposed upon the state to enforce the public trust devolves to it as a mere political subdivision of the state.

Article X, section 2 of the California Constitution provides: "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. . . . This section shall be self-executing, and the Legislature may also enact laws in the furtherance of the policy in this section contained." (Cal. Const., art X, § 2.) All uses of water, including public trust uses, are subject to the constitutional standard of reasonable use. (*National Audubon, supra*, 33 Cal.3d at p. 443.)

The County asserts that article X, section 2 subjects groundwater to the reasonable use standard, and "thus there is no basis or need to apply the public trust doctrine to groundwater." *National Audubon* answers the County's argument. The Supreme Court quoted article X, section 2 and expressly recognized that public trust uses of water remain subject to reasonable use. Nevertheless, the court rejected the notion that reasonable use or the appropriative rights system supplanted the public trust doctrine. The court wrote: "The state has an affirmative duty to take the public trust into account in the planning and allocation of water resources, and to protect public trust uses whenever feasible. Just as the history of this state shows that appropriation may be necessary for efficient use of water despite unavoidable harm to public trust values, it demonstrates that an appropriative rights system administered without consideration of the public trust may cause unnecessary and unjustified harm to trust interests. [Citations.] As a matter of practical necessity the state may have to approve appropriations despite foreseeable harm

16

to public trust uses. In so doing, however, the state must bear in mind its duty as trustee to consider the effect of the taking on the public trust [citation], and to preserve, so far as consistent with the public interest, the uses protected by the trust." (*National Audubon, supra*, 33 Cal.3d at pp. 446-447, fn. omitted.)

Despite such a formidable acknowledgment by the Supreme Court that multiple standards can exist simultaneously, the County claims the public trust doctrine and the reasonable use standard are incompatible. Missing is any citation to authority. *National Audubon* rebuts the County's unsupported and unsupportable assertion that the reasonable use standard obliterates the public trust doctrine.

Finally, the County contends the Water Code restricts the Board's authority to protect the public trust. The argument leads us down a now familiar rabbit hole. The County argues that sections 1200 and 1221 restrict the Board's authority by defining its permitting authority. But the Board's authority to apply the public trust doctrine extends to rights not covered by the permit and license system. (*In re Water of Hallet Creek Stream System* (1988) 44 Cal.3d 448, 472, fn. 16.) In fact, the Board's authority to protect the public trust is independent of and not bounded by the limitations on the Board's authority to oversee the permit and license system. (*Ibid*.) The County offers no compelling argument to the contrary and we see no rationale for finding the permitting and licensing system incompatible with the public trust doctrine.

## II

*Did the Legislature intend to occupy the entire field of groundwater management and thereby abolish all fiduciary duties to consider potential adverse impacts on the Scott River, a navigable waterway and public trust resource?*

Although one-third of Californians' water is extracted from groundwater basins and many of the state's basins are suffering from overdraft, it was not until 2014 that the California Legislature passed the Sustainable Groundwater Management Act. (§ 10720

17

et seq., added by Stats. 2014, ch. 346, § 3.) SGMA allows local agencies to voluntarily form groundwater sustainability agencies (GSA's) over a number of years. (§§ 10723, 10727.2.) They manage and regulate groundwater basins through adoption and implementation of groundwater sustainability plans (GSP's). (§§ 10723, 10727.) The GSA's are charged with procedural and substantive obligations designed to balance the needs of the various stakeholders in groundwater in an effort to preserve, and replenish to the extent possible, this diminishing and critical resource. (§§ 10721, subds. (u), (v), (x)(6), 10723.2, 10725.2, 10725.4, 10726.2, 10726.4, 10726.5.) The County hails the legislation as a general and comprehensive regulatory scheme fulfilling the Legislature's duty to protect the public trust. Specifically, the County points out that GSA's are required to regulate groundwater extractions from wells (§ 10726.4, subd. (a)(2)), the same obligation the trial court thrust upon it under the public trust doctrine. The occupation of the field by SGMA absolves the County and the Board of any common law duty it might have to consider and protect the Scott River from harmful groundwater extraction. We disagree.

It is true that a cornerstone of SGMA is a transfer of responsibility for groundwater management from the state to local jurisdictions when possible. The Legislature intended to "manage groundwater basins through the actions of local governmental agencies to the greatest extent feasible, while minimizing state intervention to only when necessary to ensure that local agencies manage groundwater in a sustainable manner." (§ 10720.1, subd. (h).) The Legislature expressly stated its intent "[t]o recognize and preserve the authority of cities and counties to manage groundwater pursuant to their police powers." (Stats. 2014, ch. 346, § 1.) The County argues that in so doing the Legislature has precluded the Board from acting to protect the public trust from groundwater extraction except in limited circumstances. (§§ 10735.2, 10735.8.) As a consequence, according to the County, neither its nor the Board's public trust duties

18

survive the enactment of SGMA. In the case of the Board, the County maintains it no longer has the authority to act.

As a general rule, statutes do not supplant the common law. (*I.E. Associates v. Safeco Title Ins. Co.* (1985) 39 Cal.3d 281, 285.) " 'Accordingly, "[t]here is a presumption that a statute does not, by implication, repeal the common law. [Citation.] Repeal by implication is recognized only where there is no rational basis for harmonizing two potentially conflicting laws." ' [Citation.]" (*Verdugo v. Target Corp.* (2014) 59 Cal.4th 312, 326 (*Verdugo*).) But the County relies on an exception to the general rule. A statute may supplant the common law if "it appears that the Legislature intended to cover the entire subject or, in other words, to 'occupy the field.' [Citations.] '[G]eneral and comprehensive legislation, where course of conduct, parties, things affected, limitations and exceptions are minutely described, indicates a legislative intent that the statute should totally supersede and replace the common law dealing with the subject matter.' " (*I.E. Associates, supra*, at p. 285.) The County insists (1) the general rule does not apply because no court has found a duty under the public trust doctrine to regulate groundwater, and (2) SGMA is a comprehensive statutory scheme reflecting the Legislature's intent to occupy the field of groundwater management and the statute, therefore, does supplant the common law public trust doctrine. *National Audubon* persuades us otherwise.

The County mischaracterizes the public trust duty. By repeatedly referring to the fact that no court has held that groundwater constitutes a public trust resource nor imposed on the state or a county the duty to regulate groundwater, the County begins with a false premise. The trial court did not find that groundwater itself was protected by the public trust doctrine; nor did it find either the Board or the County had the duty to regulate groundwater. To the contrary, the trial court found a duty to consider any adverse impacts groundwater extraction would have on a public trust resource, the Scott River. The duty, the court found, was not to regulate but to consider the impact on the

19

public trust resource and, where feasible, to preserve the public interest in the Scott River, a navigable waterway. The trial court's narrow rulings are fully supported by *National Audubon*.

*National Audubon* clarifies the common law public trust doctrine as we discussed in part I, *ante*. The court emphasized that no public agency had ever considered the adverse impacts on Mono Lake, a navigable waterway protected by the public trust doctrine, by diverting the entire flow of the Mono Lake nonnavigable tributaries into the Los Angeles Aqueduct. (*National Audubon, supra*, 33 Cal.3d at p. 447.) The DWP acquired the rights to the entire flow in 1940 from a water board "which believed it lacked both the power and the duty to protect the Mono Lake environment." (*Ibid*.) Those rights were acquired pursuant to a comprehensive appropriative water rights system administered by the Division of Water Resources. The Supreme Court analyzed the relationship between the public trust doctrine and the California water rights system. (*Id*. at pp. 445-448.) Its analysis is equally apt to the relationship between the public trust doctrine and SGMA.

The court explained: "As we have seen, the public trust doctrine and the appropriative water rights system administered by the Water Board developed independently of each other. Each developed comprehensive rules and principles which, if applied to the full extent of their scope, would occupy the field of allocation of stream waters to the exclusion of any competing system of legal thought. Plaintiffs, for example, argue that the public trust is antecedent to and thus limits all appropriative water rights, an argument which implies that most appropriative water rights in California were acquired and are presently being used unlawfully. Defendant DWP, on the other hand, argues that the public trust doctrine as to stream waters has been 'subsumed' into the appropriative water rights system and, absorbed by that body of law, quietly disappeared; according to DWP, the recipient of a board license enjoys a vested right in perpetuity to take water without concern for the consequences to the trust. [¶] We are

unable to accept either position. In our opinion, both the public trust doctrine and the water rights system embody important precepts which make the law more responsive to the diverse needs and interests involved in the planning and allocation of water resources." (*National Audubon, supra*, 33 Cal.3d at p. 445, fn. omitted.)[7]

The court concluded that neither system of thought occupied the field and both ought to be accommodated. In other words, the court endorsed two parallel systems. Moreover, the court provided a concise statement of the state's common law duty under the public trust doctrine. "The state has an affirmative duty to take the public trust into account in the planning and allocation of water resources, and to protect public trust uses whenever feasible. Just as the history of this state shows that appropriation may be necessary for efficient use of water despite unavoidable harm to public trust values, it demonstrates that an appropriative water rights system administered without consideration of the public trust may cause unnecessary and unjustified harm to trust interests. [Citations.] As a matter of practical necessity the state may have to approve appropriations despite foreseeable harm to public trust uses. In so doing, however, the state must bear in mind its duty as trustee to consider the effect of the taking on the public

---

[7] Sensitive to the Supreme Court's rejection of the notion that the comprehensive water rights system "subsumed" the public trust doctrine, the County avoids the use of the word subsumed or any of its synonyms. Rather, the County argues that SGMA "fulfills" the state's public trust duties with respect to groundwater. The County's clever word play does not save its discredited argument. In *National Audubon*, the court made the important observation that even the comprehensive appropriative water rights system in California did not weaken or decimate the public trust doctrine. Had the court accepted the essence of the County's argument it could have found, as the County urges us to do, that the Legislature fulfilled its public trust duty by enacting the appropriative water rights system. The point is not whether the public trust duty is characterized as "fulfilled" or whether a statutory scheme is characterized as "subsuming" the common law, but whether the fiduciary duties imposed by the public trust doctrine survive a statutory scheme regulating water in the state. In *National Audubon*, they did. We conclude the same fiduciary duties survive the enactment of SGMA.

21

trust [citation], and to preserve, so far as consistent with the public interest, the uses protected by the trust." (*National Audubon, supra*, 33 Cal.3d at pp. 446-447, fn. omitted.)

The SMGA is not as comprehensive as the appropriative water rights system. As ELF points out, SMGA's coverage of groundwater is incomplete by its own terms in at least four ways. First, a covered basin for purposes of SMGA means only a designated basin or subbasin identified and defined in the Department of Water Resources' Bulletin 118 or as modified pursuant to a procedure outlined in SGMA. (§ 10721, subd. (b).) Second, SGMA does not apply to any groundwater basin listed in section 10720.8, including the adjudicated portions of the Scott River stream system. (§ 10720.8, subds. (a)-(e).) Third, many requirements in SGMA do not take effect for a number of years, and even then only for some subset of the total corpus of groundwater in the state. (See, e.g., §§ 10720.7, subd. (a) [setting deadlines of 2020 or 2022 for adopting groundwater sustainability plans for certain identified basins], 10735.8, subd. (h) [delaying until 2025 any SGMA-based Board interim plan intended to remedy depletions of interconnected groundwater in probationary basins].) Finally, 26 fully adjudicated basins and three pending adjudicated basins are exempted from SGMA under section 10720.8.

We reject, therefore, the County's position that because SGMA is comprehensive it occupies the field and supplants the common law. But even if the legislation was deemed comprehensive, *National Audubon* teaches the two systems can live in harmony. If the expansive and historically rooted appropriative rights system in California did not subsume or eliminate the public trust doctrine in the state, then certainly SGMA, a more narrowly tailored piece of legislation, can also accommodate the perpetuation of the public trust doctrine.

We highlight *National Audubon* because it is factually on point, it encapsulates the most basic and important principles governing the public trust doctrine as applied to

22

navigable waterways, and it answers both of the County's arguments that no court has held that the public trust doctrine applies to groundwater and that the comprehensiveness of SGMA precludes further consideration of the public trust doctrine in approving extraction of groundwater. On the more mundane issue of whether a statute impliedly supplants the common law, *Verdugo, supra*, 59 Cal.4th 312 echoes the conclusions reached by the Supreme Court decades earlier.

In *Verdugo*, the Supreme Court attempted to discern legislative intent from the scope of the legislation, in this case the statutes governing automated external defibrillators (AED's) for use in a medical emergency. (*Verdugo, supra*, 59 Cal.4th at pp. 325-334.) The court acknowledged the presumption that a statute does not impliedly supplant the common law. (*Id.* at p. 317.) The question was whether the statutes were sufficiently comprehensive to evince a legislative intent to occupy the field. The court concluded the AED statutes did not evince any such legislative intent. (*Id.* at p. 334.)

As in *National Audubon*, there was no incongruity between the legislation and the common law. In both cases, the Supreme Court harmonized the two, concluding the parallel systems did no violence to the legislative objectives. In *Verdugo* that meant businesses could obtain immunity by voluntarily providing AED's for emergency use under the AED statutes but those statutes did not preclude the courts from finding a common law duty to acquire and make available AED's in a medical emergency. "The applicability of the immunity statutes to entities that are under a common law duty to acquire and provide an AED would not in any way reduce or undermine the incentive that the immunity statutes provide to persons or entities that voluntarily obtain and make available AEDs." (*Verdugo, supra*, 59 Cal.4th at p. 332.)

Similarly, we can evince no legislative intent to eviscerate the public trust in navigable waterways in the text or scope of SGMA. While the public trust is not expressly mentioned in SGMA, there are many provisions that reflect a legislative desire not to interfere with the existing law. These provisions certainly do not suggest the

23

Legislature intended to dismantle one of the hallmarks of water policy in the state for over 35 years. Nor is the scope of SGMA any more comprehensive than the statutes in *National Audubon* or *Verdugo*. Indeed, given the number of groundwater basins that are not covered and the time horizon before GSA's are operational, SGMA's scope is arguably even more narrow than the counterpart legislation in either case. And by whatever measure is used, the County has fallen far short of overcoming the presumption that a statute does not supplant the common law, particularly when the common law at issue embodies a doctrine as significant to the people of the state as a trust on their water. We conclude the enactment of SGMA does not, as the County maintains, occupy the field, replace or fulfill public trust duties, or scuttle decades of decisions upholding, defending, and expanding the public trust doctrine.

The County makes a valiant effort to demonstrate that the public trust doctrine does not apply to groundwater under the common law and, even if it did, SGMA abolishes any fiduciary duties the Board or the County have to take the public trust interests into account when making decisions involving groundwater that will adversely impact navigable waterways. That effort fails. Independent of these claims, however, remains the County's contention that even if the Board's fiduciary duties survive SGMA, its own duties do not. In the County's view, it never had and, continues not to have, any fiduciary duties involving groundwater. Not so.

A county is a legal subdivision of the state and references to the "state" may include counties. (*Baldwin v. County of Tehama* (1994) 31 Cal.App.4th 166, 175-176.) Although the state as sovereign is primarily responsible for administration of the trust, the county, as a subdivision of the state, shares responsibility for administering the public trust and "may not approve of destructive activities without giving due regard to the preservation of those resources." (*Center for Biological Diversity, Inc. v. FPL Group, Inc.* (2008) 166 Cal.App.4th 1349, 1370, fn. 19.)

We need only address one further argument raised by the County. The County asserts the Legislature, by enacting SGMA, rendered a conclusive judgment about the administration of the public trust, and the venerable separation of powers principle prohibits courts from intruding on the legislative prerogative. In this scenario, the Legislature is the sole keeper of the trust. The County's argument derives from a mere footnote in a case factually and legally inapposite.

We begin with the footnote in *City of Long Beach v. Mansell* (1970) 3 Cal.3d 462 (*Mansell*). "The administration of the trust by the state is committed to the Legislature, and a determination of that branch of government made within the scope of its powers is conclusive in the absence of clear evidence that its effect will be to impair the power of succeeding legislatures to administer the trust in a manner consistent with its broad purposes." (*Id*. at p. 482, fn. 17.) Relying on this footnote, the County concludes the Legislature can administer the public trust and a "system of regulation based on judicially-fashioned public trust principles" would usurp the Legislature's "conclusive" judgment in administering the trust. But the County ignores the context in which this footnote was written.

The dispute in *Mansell* involved tidelands the Legislature freed from the public trust, thereby cutting them off from water resources. (*Mansell, supra*, 3 Cal.3d at p. 482.) The dispositive issue was whether the Legislature's action violated a state constitutional provision prohibiting the grant to private persons of tidelands within two miles of any city. (*Id*. at p. 478.) The Supreme Court examined the relationship between the constitutional provision and the public trust doctrine, noting that although public trust tidelands generally are not alienable, the Legislature may determine the tidelands are no longer useful for trust purposes and free them from the trust. It was in this context the court added a footnote observing that the Legislature's decision to free the tidelands from the public trust was "conclusive." (*Id*. at p. 482, fn. 17.) The court emphasized that the case was exceptional and involved a "rare combination of government conduct and

25

extensive reliance" that "will create an extremely narrow precedent for application in future cases." (*Id.* at p. 500.)

*Mallon v. City of Long Beach* (1955) 44 Cal.2d 199 (*Mallon*), cited by the Supreme Court in *Mansell*, involved the same basic fact pattern. Again the Legislature freed income derived from tidelands from the public trust. And, as in *Mansell*, the legislative decision to curtail the trust was deemed conclusive. The court explained: "[T]he Legislature has 'found and determined' that . . . the income derived from the production of oil and gas from the tide and submerged lands of Long Beach harbor is 'no longer required for navigation, commerce and fisheries, nor for such uses, trusts, conditions and restrictions as are imposed by' statutes granting the said tide and submerged lands in trust. [Citation.] That determination and finding is conclusive upon this court." (*Mallon, supra*, at pp. 206-207.)

Neither case found an implied legislative intent to dismantle the public trust from the mere scope of a statute. Neither case compelled wholesale abolition of public trust fiduciary duties. Both instead relied on an express and limited legislative determination that specific tidelands or income derived from tidelands no longer served the public interest. As the trial court aptly found, *Mansell* and *Mallon* "stand for a limited proposition: If the Legislature determines public trust lands or waterways are no longer useful for trust purposes and frees them from the trust, that determination is conclusive. It will not be second guessed by the courts. Neither case is applicable here. The Legislature has not released the Scott River from the public trust. Therefore, requiring the County to consider the public trust in approving well permits does not infringe upon any 'conclusive' legislative determination."

The County concedes this case involves the regulation of water rather than the ownership of tidelands and urges us to follow water regulation cases such as *Colberg, Inc. v. State of California ex rel. Dept. Pub. Wks, supra*, 67 Cal.2d 408 and *Boone v. Kingsbury* (1928) 206 Cal. 148. We agree with ELF that neither case actually involves

26

the regulation of water. By means of a specific state statute in both cases the Legislature weighed the competing public interests and made a determination which interest prevailed. The cases bear no relevance to the dispositive questions before us.

Whether the Legislature could supersede or limit the Board's public trust authority if it wanted to is a question for another day. At present, we can find no violation of the separation of powers because, as we explained at length above, we have found no legislative intent to occupy the field and thereby to dissolve the public trust doctrine within the text or scope of SGMA.

## DISPOSITION

The judgment is affirmed. ELF and the Board shall recover costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

                                       RAYE , P. J.

We concur:

    ROBIE , J.

    BUTZ , J.

27