# IN THE SUPREME COURT OF IOWA

No. 19–1644

Submitted December 16, 2020—Filed June 18, 2021
Amended October 12, 2021

**IOWA CITIZENS FOR COMMUNITY IMPROVEMENT** and **FOOD & WATER WATCH,**

Appellees,

vs.

**STATE OF IOWA; DEPARTMENT OF NATURAL RESOURCES; BRUCE TRAUTMAN,** In His Official Capacity as Acting Director of the Department of Natural Resources; **ENVIRONMENTAL PROTECTION COMMISSION; MARY BOOTE, NANCY COUSER, LISA GOCHENOUR, REBECCA GUINN, HOWARD HILL, HAROLD HOMMES, RALPH LENTS, BOB SINCLAIR,** and **JOE RIDING,** In Their Official Capacities as Commissioners of the Environmental Protection Commission; **NATURAL RESOURCE COMMISSION; MARCUS BRANSTAD, RICHARD FRANCISCO, LAURA HOMMEL, TOM PRICKETT, PHYLLIS REIMER, DENNIS SCHEMMEL,** and **MARGO UNDERWOOD,** In Their Official Capacities as Commissioners of the Natural Resource Commission; **DEPARTMENT OF AGRICULTURAL AND LAND STEWARDSHIP;** and **MICHAEL NAIG,** In His Official Capacity as Secretary of Agriculture,

Appellants.

---

Appeal from the Iowa District Court for Polk County, Robert B. Hanson, Judge.

The State of Iowa and state agencies and officials seek interlocutory review of a district court order denying their motion to dismiss an action brought by two nonprofit groups under the public trust doctrine. **REVERSED AND REMANDED.**

Mansfield, J., delivered the opinion of the court, in which Christensen, C.J., and Waterman and McDermott, JJ., joined. Appel, J., filing a dissenting opinion. McDonald, J., filing a dissenting opinion, in

which Oxley, J., joined.  Oxley, J., filed a dissenting opinion, in which Appel, J., joined.

Thomas J. Miller, Attorney General, Jeffrey S. Thompson (argued), Solicitor General, Jacob J. Larson, David S. Steward, Eric M. Dirth, and Thomas J. Ogden, Assistant Attorneys General, for appellants.

Brent Newell (argued) and Kellan R. Smith of Public Justice, P.C., Oakland, California, Roxanne Barton Conlin and Devin Kelly of Roxanne Conlin & Associates, P.C., Des Moines, Tarah Heinzen of Food & Water Watch, Portland, Oregon, and Channing Dutton of Lawyer, Lawyer, Dutton, and Drake, LLP, West Des Moines, for appellees.

James L. Pray, Jordan D. Nickerson, and Tess L. Pocock of Brown, Winick, Graves, Gross, Baskerville and Schoenebaum, PLC, Des Moines for amicus curiae Agricultural Legal Defense Fund.

Tucker F. Levis and Christina L. Gruenhagen of Parker & Geadelmann, P.L.L.C., West Des Moines; and Eldon McAfee of Brick Gentry P.C., West Des Moines, for amicus curiae Iowa Cattlemen's Association, Iowa Corn Growers Association, Iowa Farm Bureau Federation, Iowa Pork Producers Association, Iowa Poultry Association, Iowa Soybean Association, Iowa State Dairy Association, and Iowa Turkey Federation.

Paige Fiedler of Fiedler Law Firm, Johnston; and Joel R. Waltzer and Robert B. Wiygul of Waltzer Wiygul & Garside, New Orleans, Louisiana, for amicus curiae Gulf Organized Fisheries in Solidarity and Hope, Inc., and Mississippi Commercial Fisheries United, Inc.

Richard A. Malm and John E. Lande of Dickinson, Mackaman, Tyler & Hagen, P.C., Des Moines, for amicus curiae Board of Water Works Trustees of the City of Des Moines, Iowa.

Chad A. Swanson of Dutton, Daniels, Hines, Kalkhoff, Cook & Swanson, P.L.C., Waterloo, and Paige M. Tomaselli of The Law Office of Paige Tomaselli, Richmond, California, for amicus curiae Iowa Farmers Union and Farm Aid.

Neil Hamilton, Drake University Law School, Des Moines, for amicus curiae Drake Law Professors Neil Hamilton, Allan Vestal, Mark Kende, and Jerry Anderson.

**MANSFIELD, Justice.**

Two social justice organizations have brought this case against the State of Iowa, four different state agencies, and a number of state officials. Relying on the public trust doctrine, under which the State is the "trustee" of the State's navigable waters, they seek to force the defendants to enact legislation that will compel Iowa farmers to take steps that will have the effect of significantly reducing levels of nitrogen and phosphorus in the Raccoon River. This, they allege, will improve their members' aesthetic and recreational use of the river and bring about reductions in their water bills.

The defendants moved to dismiss the petition based on lack of standing, nonjusticiability, and failure to exhaust administrative remedies. The district court denied the motion. On appeal, we now conclude that the motion should have been granted on the first two grounds. In our view, the attenuated causation theory of the petition is not enough to establish that the plaintiffs' members have suffered a concrete injury at the hands of the defendants that a favorable court decision is likely to redress. And, we believe the plaintiffs' effort to repurpose the historically narrow public trust doctrine to solve a complex environmental problem presents a nonjusticiable political question. Therefore, we reverse the district court's order and remand with instructions to dismiss the petition.

## I. Factual and Procedural Background.

**A. The Nature of the Litigation and the Parties.** This is an action for declaratory relief and to compel the State of Iowa to adopt "a Raccoon River remedial plan with mandatory agricultural water pollution controls."

The plaintiffs are Iowa Citizens for Community Improvement (ICCI) and Food and Water Watch (FWW). ICCI has 5100 members, of whom

2404 reside in Polk County. Many of those members recreate in, on, or around the Raccoon River in Polk County. ICCI's organizational priorities include "fighting factory farms and campaigning to clean up Iowa's polluted waterways, as well as advancing worker justice, racial justice, and immigrants' rights."

FWW "champions healthy food and clean water for all by standing up to corporations that put profits before people and advocating for a democracy that improves people's lives and protects the environment." FWW has 18,400 "members and supporters" in Iowa, and 2804 "members and supporters" in Polk County.

The defendants are the State of Iowa, the Iowa Department of Natural Resources (DNR), the director of DNR, the Environmental Protection Commission, the members of the Environmental Protection Commission, the Natural Resource Commission, the members of the Natural Resource Commission, the Iowa Department of Agriculture and Land Stewardship, and the secretary of agriculture. Thus, the petition names twenty-three separate defendants.

**B. Factual Allegations in the Petition.** The petition alleges that Iowa leads the nation in corn and pork production, and is one of the leaders in soybean production. But according to the petition, this food production comes at a cost. Iowa farmers "apply vast amounts of fertilizer to grow corn and soybeans." They also apply manure from animal feeding operations to corn and soybeans as fertilizer. Fertilizer and manure contain nitrogen, which is converted to nitrates. They also contain phosphorus.

Some of these nitrates and phosphorus run off into the Raccoon River watershed. They contribute to the growth of cyanobacteria, which excrete cyanotoxins.

Climate change—specifically, higher air and water temperatures and more frequent heavy rains—have also led to more nitrates and phosphorus in the watershed and more cyanobacteria proliferation.

Since 1974, average nitrate levels in the Raccoon River have increased significantly. The Des Moines Water Works has had to incur costs to remove nitrates from Raccoon River water so the Class C drinking water standard of 10 mg/1 is met before the water actually reaches the customer. Currently, there is no mandatory state plan for the reduction of nitrates in the Raccoon River.

DNR has authorized animal feeding operations to apply manure to frozen, snow-covered ground, which has resulted in discharges to navigable waters. The Iowa legislature has appropriated insufficient funds to DNR to implement and enforce water quality protections at animal feeding operations. Legislation to impose a moratorium on new medium and large animal feeding operations has been introduced in the Iowa legislature but has not passed.

In 2008, environmental groups inside and outside Iowa tried to get the Federal Environmental Protection Agency (EPA) to promulgate numeric water quality standards for nitrogen and phosphorus. The EPA said no. Instead, in 2011, the EPA announced a policy to defer to states on nitrogen and phosphorus regulation. EPA recommended states implement "voluntary agricultural nonpoint source controls." Efforts to overturn the EPA's decision not to act were unsuccessful. *See generally Gulf Restoration Network v. McCarthy*, 783 F.3d 227, 243–44 (5th Cir. 2015) (holding that the EPA had discretion not to issue water quality standards for nitrogen and phosphorus if it provided a reasonable explanation).

Nitrogen and phosphorus entering the Gulf of Mexico from, in part, the Mississippi River Basin "has created a hypoxic zone spanning

thousands of square miles." A 2008 Gulf Hypoxia Action Plan calls for Iowa and other states along the Mississippi River to reduce nitrogen and phosphorus loadings to the Gulf of Mexico so that a 45% reduction in total levels is achieved.

In 2013, the Iowa legislature enacted legislation to authorize and fund the Iowa Nutrient Reduction Strategy. 2013 Iowa Acts ch. 132, § 60 (codified at Iowa Code § 466B.42 (2014)). This strategy identifies best management practices to reduce nitrogen and phosphorus discharges into surface waters but does not require adoption or implementation of any specific measure or practice. Only limited progress has been made; statewide improvements will require "a much greater degree of implementation than has occurred so far."

In the 2018 session, the Iowa legislature enacted section 20 of Senate File 512, making the Iowa Nutrient Reduction Strategy the state policy for nitrogen and phosphorus water pollution controls. 2018 Iowa Acts ch. 1001, § 20 (codified at Iowa Code § 455B.177(3) (2019)).

**C. The Plaintiffs' Legal Claims.** The plaintiffs' claims are all based on the public trust doctrine. The plaintiffs allege that their members are beneficiaries under the public trust doctrine and that the State has a duty to protect the public use of navigable waters and to prevent substantial impairment of navigable waters. They allege that the State has abdicated control of the meandered section of the Raccoon River to private parties by pursuing a "voluntary" nitrogen and phosphorus control strategy for agricultural nonpoint sources.

ICCI and FWW members suffer harm in several ways. Des Moines Water Works, which serves the metropolitan Des Moines area and draws water from the Raccoon River, incurs capital, operational, maintenance, and monitoring costs to reduce nitrate and cyanotoxin contamination.

This results in higher costs for drinking water. ICCI and FWW members also have concerns about health risks from consuming water containing nitrates and microcystins. In addition, ICCI and FWW members suffer aesthetic injury and injury to their recreational use of the Raccoon River for swimming and kayaking. There have been several days when levels of microcystins impaired swimming and kayaking in the river.

The plaintiffs seek both declaratory and injunctive relief, at a high level of generality. In brief, they seek a declaration that the State violated the public trust doctrine by not protecting the public's recreational and drinking water use of navigable waters. They also seek a declaration that section 20 of Senate File 512 is null and void as inconsistent with the public trust doctrine. They further seek an injunction against the State from taking any further action that would violate the public trust doctrine. They ask for an injunction requiring the State "to adopt and implement a mandatory remedial plan to restore and protect public use that requires agricultural nonpoint sources and CAFO's [confined animal feeding operations] to implement nitrogen and phosphorus limitations in the Raccoon River watershed." And, finally, until that plan is working, they seek an injunction against the State authorizing the construction and operation of new medium and large animal feeding operations and confined animal feeding operations in the Raccoon River watershed.

**D. The Motion to Dismiss.** On April 29, 2019, the defendants moved to dismiss the petition based on lack of standing, nonjusticiability, and failure to exhaust administrative remedies. On May 10, the plaintiffs filed a resistance. The district court held a hearing on June 19. On September 10, the court issued an order denying the defendants' motion to dismiss.

The defendants sought an interlocutory appeal, and we granted their application. We retained the appeal.

## II. Standard of Review.

We review questions of standing and whether an action should be dismissed as nonjusticiable for correction of errors at law. *State ex rel. Dickey v. Besler*, 954 N.W.2d 425, 430 (Iowa 2021).

## III. Legal Analysis.

**A. The Public Trust Doctrine.** Although the merits of this case are not before us, some understanding of the public trust doctrine is required to address the standing and justiciability issues that are before us.[1]

The public trust doctrine "is based on the notion that the State is a steward of our natural resources." *Fencl v. City of Harpers Ferry*, 620 N.W.2d 808, 814 (Iowa 2000) (en banc). But it "has a narrow scope." *Id.* at 813. It "originally applied to the beds of navigable waters, but has now expanded to embrace the public's use of lakes and rivers for recreational purposes as well." *Larman v. State*, 552 N.W.2d 158, 161 (Iowa 1996). It protects "the public's right of access to public waters." *Id.* And, it "limits the State's power to dispose of land encompassed within the public trust."

---

[1]Standing cannot be considered in a vacuum without reference to the source of the legal claims. *See, e.g.*, *State ex rel. Food & Water Watch v. State*, 100 N.E.3d 391, 397 (Ohio 2018) (per curiam) (finding there was no standing because "a plain reading of the statute does not support, and [the plaintiff] has not shown, that the writ sought—one that would mandate the promulgation of rules—will likely redress the purported injury").

Likewise, we have said before that "the political question grounds and the failure to state a claim grounds are interrelated." *King v. State*, 818 N.W.2d 1, 12 (Iowa 2012). To determine whether a claim is within the competence of the judiciary to handle, it is appropriate to understand what the claim is. We do not agree with the suggestion that the political question doctrine cannot be raised unless the party raising it is also seeking to dismiss for failure to state a claim. A party can concede that a novel theory—like the plaintiffs' expansive version of public trust doctrine—would state a claim and still argue that it would not redress the plaintiffs' injuries and be unworkable for courts to administer.

*Id.* These two principles of public access and no private alienation are interrelated. Obviously, if some part of the public trust is turned over to a private party, then the public no longer has access to it.

We have repeatedly discussed and applied the public trust doctrine as embodying these twinned notions of open access and no private alienation. *See State v. Pettijohn*, 899 N.W.2d 1, 35 (Iowa 2017) (explaining that the doctrine involves "the 'paramount' right of Iowans to use state waterways for navigational and recreational purposes" and noting that Congress declared the navigable waters leading into the Mississippi to be "common highways, and forever free as well to the inhabitants of said State, as to all other citizens of the United States"); *Orr v. Mortvedt*, 735 N.W.2d 610, 615 (Iowa 2007) ("The public generally has a right of access to navigable watercourses."); *State v. Sorensen*, 436 N.W.2d 358, 362 (Iowa 1989) (noting "the stringent limitations on the state's power to alienate" public trust resources); *Witke v. State Conservation Comm'n*, 244 Iowa 261, 270–72, 56 N.W.2d 582, 588–89 (1953) (rejecting a fee for access to Clear Lake that was not based on an improvement or service provided); *Peck v. Alfred Olsen Constr. Co.*, 216 Iowa 519, 522, 245 N.W. 131, 133 (1932) ("[T]he power and the duty conferred upon the state under such title is to maintain and promote the navigation and navigability of such lake."). In *State v. Meyers*, we recently invoked the public trust doctrine in holding that a group of private property owners could not convert a navigable stream to their own private lake simply by blocking access to it. *See* 938 N.W.2d 205, 210–12 (Iowa 2020).

Many of our cases contain language that the public trust doctrine protects public "use" of public trust property. For example, in *State v. Sorensen* we said,

The public trust doctrine, however, is not limited to navigation or commerce; it applies broadly to the public's *use* of property, such as waterways, without ironclad parameters on the types of uses to be protected. *See* [Richard J.] Lazarus, [*Changing Conceptions of Property and Sovereignty in Natural Resources: Questioning the Public Trust Doctrine,* 71 Iowa Law Review 631, ] 649 [(1986)]; 65 C.J.S. *Navigable Waters* § 92, at 289–91 [(1966)] (Public trust purposes include "rights of navigation, commerce, fishing, bathing, recreation, or enjoyment, and other appropriate public and useful purposes, or such other rights as are incident to public waters at common law, free from obstruction and interference by private persons. . . .").

436 N.W.2d at 363. Still, even in this context "use" means *access*—i.e., the right to enter "free from obstruction and interference by private persons." *Id.* (quoting 65 C.J.S. *Navigable Waters* § 92, at 289–91.)

Historically, in Iowa, the public trust doctrine has not provided an opening for courts to *weigh* different uses, that is, to second-guess *regulatory* decisions made by elected bodies. In *Bushby v. Washington County Conservation Board,* we explained that "[t]he purpose of the public-trust doctrine is to prohibit states from 'conveying important natural resources' to private parties." 654 N.W.2d 494, 497 (Iowa 2002) (quoting *Fencl,* 620 N.W.2d at 814). We elaborated,

In Iowa this doctrine was originally applied to the beds of navigable waters and has been expanded to include the recreational use of lakes and rivers. Nevertheless, the scope of the public-trust doctrine in Iowa is narrow, and we have cautioned against overextending the doctrine. We are convinced that it does not serve as an impediment to legally sanctioned management of forested areas by the public bodies entrusted by law with their care.

*Id.* at 498 (citations omitted). Thus, we rejected an attempt in *Bushby* to use the public trust doctrine to enjoin a clear-cutting of trees on public land that had been approved by the elected board of supervisors. *Id.* While the plaintiffs preferred that this reserve be left alone in its "fairly natural state," the county's representatives had determined otherwise. *Id.* at 495–

96; *see also Magers-Fionof v. State,* 555 N.W.2d 672, 674 (Iowa 1996) (stating it was "very doubtful" that the public trust doctrine provided a cause of action against the state for injury to trees grown in state parks).

Within the last year, the Minnesota Supreme Court has held that the public trust doctrine did not support a claim against the Minnesota Department of Natural Resources alleging mismanagement, pollution, and impairment of a lake. *White Bear Lake Restoration Ass'n ex rel. State v. Minn. Dep't of Nat. Res.,* 946 N.W.2d 373, 376–77 (Minn. 2020). The Minnesota court explained that "the doctrine was used from its inception to define property rights in navigable waters, entrusting them to the state for public use rather than allowing riparian owners to assert a private property interest." *Id.* at 385. The court quoted from the seminal United States Supreme Court decision which made clear that "[t]he doctrine is founded upon the necessity of preserving to the public the use of navigable waters from private interruption and encroachment." *Id.* (*quoting Ill. Cent. R.R. v. Illinois*, 146 U.S. 387, 436, 13 S. Ct. 110, 112 (1892)). The court then emphasized that the plaintiff had not alleged a violation of that duty "to protect public use from 'private interruption and encroachment." *Id.* at 386. Instead, the plaintiff contended that the Minnesota DNR had issued groundwater permits that resulted in degradation of the lake. *Id.* The court observed, "We have found no precedent—and, at oral argument, counsel for [the plaintiff] could cite none—extending the public trust doctrine in this way." *Id.* Finally, the court concluded,

> Twenty-five chapters within Minnesota Statutes are dedicated to water protection, use, and appropriation. . . . Because the Legislature has established structures within which public water use priorities are to be balanced, and no private encroachment or diversion to another state has been alleged, we see no need to extend the judiciary's common-law role in this instance.

*Id.* (citation omitted).

Again, the merits are not before us on this appeal. Accordingly, we assume for present purposes that the public trust doctrine could be expanded to serve the plaintiffs' regulatory ends. The questions we need to answer is whether the plaintiffs have standing to bring their case and whether their case is justiciable.

**B. Standing.** For there to be standing in federal court, a plaintiff must show not only (1) injury in fact, but also that the injury in fact (2) is fairly traceable to the defendants' conduct and (3) is likely to be redressed by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 2136 (1992).

> [A] litigant must demonstrate that it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury.

*Massachusetts v. EPA*, 549 U.S. 497, 517, 127 S. Ct. 1438, 1453 (2007). All three requirements are bedrock requirements of Article III constitutional standing in the federal courts. *Lujan*, 504 U.S. at 560, 112 S. Ct. at 2136 (referring to the "irreducible constitutional minimum of standing"). They are not mere prudential considerations. *Id.*

In Iowa, we follow a two-prong approach. "Our cases have determined that a complaining party must (1) have a specific personal or legal interest in the litigation and (2) be injuriously affected." *Citizens for Responsible Choices v. City of Shenandoah*, 686 N.W.2d 470, 475 (Iowa 2004); *see also Berent v. City of Iowa City*, 738 N.W.2d 193, 202 (Iowa 2007) ("We have held that in order to have standing a party must (1) have a specific personal or legal interest in the litigation and (2) be injuriously affected."). "This inquiry is separate from, and precedes, the merits of a

case." *Horsfield Materials, Inc. v. City of Dyersville*, 834 N.W.2d 444, 452. (Iowa 2013).

We have said that "[w]ith state courts, standing is a self-imposed rule of restraint." *Hawkeye Bancorporation v. Iowa Coll. Aid Comm'n*, 360 N.W.2d 798, 802 (Iowa 1985). But that doesn't make the standing requirement any less real. After all, article III, section 1 of the state constitution prohibits the judicial branch from exercising any function properly belonging to the legislative or executive branch. Iowa Const. art. III, § 1. Article V, section 6 provides that Iowa courts operate as "court[s] of law and equity." *Id.* art. V, § 6. We have repeatedly said that the plaintiff "must" be injuriously affected to have standing. *See, e.g., Horsfield Materials*, 834 N.W.2d at 452; *Godfrey v. State*, 752 N.W.2d 413, 418 (Iowa 2008); *Berent*, 738 N.W.2d at 202; *Alons v. Iowa Dist. Ct.*, 698 N.W.2d 858, 869–71 (Iowa 2005); *Citizens for Responsible Choices*, 686 N.W.2d at 475.

Our court has interpreted the "injuriously affected" prong of standing as incorporating the *Lujan* three-part test. In *Alons v. Iowa District Court*, we quoted from *Lujan* at length, including the three-part test and the "irreducible constitutional minimum" language. 698 N.W.2d at 867–68. We noted there were separate, additional prudential considerations. *Id.* at 868–69. We then essentially said that the federal test—both constitutional and prudential—was "not dissimilar from our own test," and "[w]e therefore consider the federal authority persuasive." *Id.* at 869. So, *Alons* aligned us with *Lujan*.

In *Godfrey v. State*, we said that the second and third requirements from *Lujan* "largely relate to the prudential concerns we have recognized, and we too have relied on them to resolve standing claims in the past." 752 N.W.2d at 422. We identified *Citizens for Responsible Choices v. City of Shenandoah* as a case decided on traceability grounds—i.e., the second

*Lujan* test. *Id.* (citing *Citizens for Responsible Choices*, 686 N.W.2d at 472, 475). Still, regardless of whether we characterize these requirements as constitutional or prudential, traceability and redressability are a part of standing in Iowa. *See also Horsfield Materials*, 834 N.W.2d at 457–58 (quoting *Godfrey* as recognizing the *Lujan* three-part test).[2]

Think about it this way: If the court can't fix your problem, if the judicial action you seek won't redress it, then you are only asking for an advisory opinion. *See Schmidt v. State*, 909 N.W.2d 778, 800 (Iowa 2018) ("We do not issue advisory opinions."). In *Dickey v. Iowa Ethics & Campaign Disclosure Board*, we found that the district court lacked standing to hear a campaign finance reporting case where a favorable ruling in the case would not provide additional information to the petitioner. 943 N.W.2d 34, 38–41 (Iowa 2020). We stated, "Courts exist to hear claims brought by injured parties; [the petitioner] is not injured." *Id.* at 40.

> In a broad sense, standing is deeply rooted in the separation-of-powers doctrine and the concept that the branch of government with the ultimate responsibility to decide the constitutionality of the actions of the other two branches of government should only exercise that power sparingly and in a manner that does not unnecessarily interfere with the policy and executory functions of the two other properly elected branches of government. While this policy of standing has no specific constitutional basis in Iowa, as it does in federal law, it is compatible with the overall constitutional framework in this state and properly reflects our role in relationship to the other two coequal branches of government. This ultimate power to decide disputes between the other branches of government and to determine the constitutionality of the acts

---

[2]And the *Lujan* three-part test remains part of federal standing law as well. *See Carney v. Adams*, ___ U.S. ___, ___, 141 S. Ct. 493, 498 (2020) (quoting and applying the *Lujan* test); *Spokeo, Inc. v. Robins*, ___ U.S. ___, ___, 136 S. Ct. 1540, 1547 (2016) (same); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 133 S. Ct. 1138, 1147 (2013) (same).

A "speculative chain of possibilities" is not enough. *Clapper*, 568 U.S. at 414, 133 S. Ct. at 1150. Standing "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id.* at 408, 133 S. Ct. at 1146.

of the other branches of government does not exist as a form of judicial superiority, but is a delicate and essential judicial responsibility found at the heart of our superior form of government. We have the greatest respect for the other two branches of government and exercise our power with the greatest of caution.

*Godfrey*, 752 N.W.2d at 425 (citation omitted).

When the asserted injury arises from the government's allegedly unlawful failure to regulate someone else, "the plaintiff must establish 'a causal connection between the injury and the conduct complained of' and that the injury is ' "likely," as opposed to merely "speculative," to be "redressed by a favorable decision." ' " *Godfrey*, 752 N.W.2d at 421 (quoting *Lujan*, 504 U.S. at 561, 112 S. Ct. at 2136); *see also Alons*, 698 N.W.2d at 868 (quoting the same language); *Sanchez v. State*, 692 N.W.2d 812, 821 (Iowa 2005) (same).

Here, it is speculative that a favorable court decision in this litigation would lead to a more aesthetically pleasing Raccoon River, better swimming and kayaking on the river, and lower water rates in the Des Moines metropolitan area. As already noted, to a large extent the plaintiffs are simply seeking broad, abstract declarations in this litigation.[3] Such general declarations do not provide any assurance of concrete results, although they do herald long-term judicial involvement. The only specific

---

[3]There are six operative paragraphs in the prayer for relief. Paragraphs A and B simply seek declarations that the State has a duty to protect the public's recreational and drinking water use and that the public trust doctrine has been violated. Paragraph F enjoins the State from taking further actions to violate the public trust doctrine. These are generalities.

Paragraph C seeks a declaration that section 20 of SF 512 is null and void. Paragraph D purports to require the State to adopt and implement a mandatory remedial plan that requires agricultural nonpoint sources and CAFOs to implement nitrogen and phosphorus limitations in the Raccoon River watershed—with no detail beyond that. And paragraph E would impose a moratorium on new and expanded large and confined animal feeding operations until the State does so.

declaration the plaintiffs request is that section 20 of Senate File 512 be declared void and unconstitutional. That section reads as follows:

> The general assembly further finds and declares that it is in the interest of the people of Iowa to assess and reduce nutrients in surface waters over time by implementing the Iowa nutrient reduction strategy. To evaluate the progress achieved over time toward the goals of the Iowa nutrient reduction strategy and the United States environmental protection agency gulf hypoxia action plan, the baseline condition shall be calculated for the time period from 1980 to 1996.

2018 Iowa Acts ch. 1001, § 20.

We do not see how declaring this section void would lead to lower water rates, more viewing enjoyment of the Raccoon River, or more swimming and kayaking opportunities in the Raccoon River for the plaintiffs' members.

The injunctive relief sought by the plaintiffs is also quite general. The plaintiffs ask us to enjoin the "State"—meaning the twenty-three different defendants in the lawsuit—to come up with "a mandatory remedial plan" that requires all grain and livestock producers "to implement nitrogen and phosphorus limitations in the Raccoon Valley watershed." The plaintiffs admit that this plan can only be accomplished through legislation. In fact, they argue they need not exhaust administrative remedies because what they seek can *only* be accomplished through legislation. In their words: "[T]he agency Defendants lack authority to require nutrient limits for nitrogen and phosphorus from agricultural nonpoint sources." Only the legislature can do this.

But this leads immediately to the question of what that legislation would look like. There is no free lunch. According to the 2008 Water Quality Improvement Plan that is cited in the petition (and therefore part

of the materials we may consider),[4] a 50% reduction in overall fertilizer application in the watershed—a dramatic change—would only produce a 20% reduction in Raccoon River nitrate levels. This would not come close to meeting the 48.1% reduction in nitrate levels that the plaintiffs allege is needed for the Raccoon River to consistently have a nitrate level below 10 mg/l and therefore meet the Class C drinking water standard without further treatment.

Farmers use fertilizer for economic reasons, so this reduction in fertilizer application would affect yields and make Iowa farmers less competitive. The legislature might decide to charge the costs of efforts to reduce nitrogen and phosphorus runoff to the public rather than just to farmers. The legislature might decide that it is appropriate for all users of the Raccoon River watershed to bear these costs. This could lead to even higher out-of-pocket expenditures for the plaintiffs' members.

Notably, to the extent the issue is the need to remove nitrate pollution from drinking water in order to make it drinkable, the Des Moines Water Works (DMWW) is the party more directly affected and better positioned to bring a lawsuit. It has already brought a lawsuit— unsuccessfully. *See Bd. of Water Works Trs. of Des Moines v. Sac Cnty. Bd. of Supervisors*, 890 N.W.2d 50 (Iowa 2017); *Bd. of Water Works Trs. of Des Moines v. Sac Cnty. Bd. of Supervisors*, 2017 WL 1042072 (N.D. Iowa Mar. 17, 2017). There, DMWW sought money damages for costs of removing nitrates. *Bd. of Water Works Trs. of Des Moines*, 890 N.W.2d at 52. DMWW "d[id] not suggest it would be cheaper for the [rural] drainage districts to remove nitrates from multiple locations than for DMWW to

---

[4]*See King*, 818 N.W.2d at 6 n.1 (holding that in ruling on a motion to dismiss for failure to state a claim, the court may consider documents referenced in the petition regardless of whether they have been attached).

remove nitrates from a single location." *Id.* at 66. DMWW's removal of nitrates for drinking water purposes costs about one cent per day per customer. *Id.* at 68.

Also, it is not clear that even significant reductions in farmers' fertilizer use would actually bring about better kayaking, swimming, and viewing on the river. According to the petition, cyanobacteria blooms, cyanotoxins, and microcystins are all increasing due to climate change.

There is not enough here to demonstrate that a favorable outcome in this case is likely to redress the plaintiffs' alleged reduced ability to kayak, swim, or enjoy views of the Raccoon River, or would save them money on drinking water. The plaintiffs' claims must therefore be dismissed for lack of standing.[5]

Finally, we address the suggestion that the defendants conceded at oral argument that there would be standing for the plaintiffs' declaratory judgment claim. Here is the actual exchange between a member of our court and defense counsel:

> QUESTION: So is what you're saying, if -- if they didn't ask for the injunctive relief or if we agreed with you that the injunctive relief was subject to the political question doctrine and then got rid of that, could the lawsuit proceed just on the declaratory relief that they're requesting? ANSWER: I think it's possible, yes. I mean -- and I'm just -- again, I'm accepting a lot of what-ifs here. Because the relief is the key, and the -- and the claims that they've asserted are the basis for the

---

[5]We found that the Sierra Club had standing to challenge a pipeline in *Puntenney v. Iowa Utilities Board*, 928 N.W.2d 829, 837–38 (Iowa 2019). But there was no speculative chain there. The injury came from one event—the construction and operation of a crude oil pipeline. *Id.* at 837. The issue was whether there was legal authority to build the pipeline. *Id.* at 832–33. The relief requested was to stop the pipeline. *Id.* A favorable decision on that point would have stopped the pipeline, at least until it had been built. *Id.* at 839–40. Contrast *Puntenney* with *Citizens for Responsible Choices*, where we held that the plaintiffs lacked standing to challenge the issuance of bonds because any injury would not result from the issuance of bonds per se, but from the project financed by the bonds. 686 N.W.2d at 475. The chain of causation, in other words, was too remote.

declaratory relief that they're seeking, and so it's kind of a naked request, if you will.

And so -- and -- and I will have to concede that when we talk about redressability and causal connection to the injury, you know, it -- it -- the declaratory order, assuming that these are citizens that, you know, would be, under Justice McDonald's analogy, beneficiaries of the trust, I -- I think I'd have to concede you could get to, if you wanted to, a declaratory order of some sort.

But if we back into the overall framework of this lawsuit, it -- it doesn't get them what they're asking for, and *it doesn't remedy any of the alleged harms that they allege.*

(Emphasis added.)

Several points should be noted. First, the question assumed that the injunctive relief claims would be subject to the political question doctrine and would not go forward. The issue was whether a declaratory judgment action alone could proceed.

Second, although we do not find that defense counsel actually agreed the declaratory judgment part of the case could go forward, parties cannot bind us by an agreement that standing exists. Standing is jurisdictional. *Northbrook Residents Ass'n v. Iowa State Dep't of Health Off. for Health Plan. & Dev.*, 298 N.W.2d 330, 331 (Iowa 1980); *see also Godfrey*, 752 N.W.2d at 417 ("Generally, courts refuse to decide disputes presented in a lawsuit when the party asserting an issue is not properly situated to seek an adjudication."). In *Bechtel v. City of Des Moines*, we observed that even with a declaratory judgment case "a justiciable controversy must exist; we will not decide an abstract question simply because litigants desire a decision on a point of law or fact." 225 N.W.2d 326, 330 (Iowa 1975) (en banc).

Third, even while conceding that "you could get to, if you wanted to, a declaratory order of some sort," defense counsel added that "the relief is the key." Thus, defense counsel pointed out that a declaratory order would

not remedy "any of the alleged harms that [the plaintiffs] allege." We agree and therefore conclude that standing is absent in this case.

**C. Nonjusticiable Political Question.** We have described the doctrine as follows:

> A political question may be found when one or more of the following considerations is present:
>
> (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; (2) a lack of judicially discoverable and manageable standards for resolving the issue; (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; (4) the impossibility of a court's undertaking independent resolution without expressing a lack of the respect due coordinate branches of government; (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Besler*, 954 N.W.2d at 435 (quoting *King v. State*, 818 N.W.2d 1, 17 (Iowa 2012)).

The plaintiffs urge us to reject the political question doctrine out of hand for two reasons. First, they claim it does not apply to state courts. This position rests on an incorrect reading of *Freeman v. Grain Processing Corp.*, 848 N.W.2d 58 (Iowa 2014). In *Freeman,* we concluded the political question doctrine did not apply to the facts of *that* case. *Id.* at 93–94. But we acknowledged it had been applied in other cases. *Id.* at 89, 92 (discussing *Des Moines Register & Tribune Co. v. Dwyer*, 542 N.W.2d 493 (Iowa 1996) (en banc), and *State ex rel. Turner v. Scott,* 269 N.W.2d 828 (Iowa 1978) (en banc)); *see also King*, 818 N.W.2d at 21 n.17 ("There is a political question doctrine in Iowa as elsewhere.").

We applied the political question doctrine recently in *State ex rel. Dickey v. Besler.* 954 N.W.2d at 435–37. In *Besler*, we decided not to hear a lawsuit as to which of two officials (the Governor or the chief justice)

should have made an appointment when both had previously agreed to recognize the appointment made by one of them (the Governor).  *Id.*

Second, the plaintiffs insist that "constitutional claims are always justiciable."  Whatever the plaintiffs mean by this assertion, it is plainly too broad.  *Besler* involved a constitutional claim, and we found the case nonjusticiable.  In particular, the relator in *Besler* asserted that article V, section 15 of the Iowa Constitution required the chief justice rather than the Governor to make the appointment.  *Id.* at 428–30.

The plaintiffs rely on *Luse v. Wray*, 254 N.W.2d 324 (Iowa 1977) (en banc).  They are correct that in *Luse*, we held that claims brought by voters whose votes weren't counted in a disputed state legislative election resolved by the legislature were justiciable.  *Id.* at 326–29.  We acknowledged that article III, section 7 provides, "Each house shall choose its own officers, and judge of the qualification, election, and return of its own members."  *Id.* at 326 (quoting Iowa Const. art. III, § 7).  Yet the key point in *Luse* was that the voters had alleged substantial deprivations of their personal equal protection and due process rights when their votes weren't counted.  *Id.* at 328.  As we stated,

> Iowa courts have power to adjudicate substantial claims of deprivation of federal or Iowa constitutional rights by the houses of the Iowa General Assembly in the exercise of the houses' election contest powers under § 7 of Article III of the Iowa Constitution.

*Id.*  Just a year later, in *State ex rel. Turner*, we clarified the limited scope of the *Luse* holding when we decided that whether a successful legislative candidate had met the residency requirement set forth in article III, section 5 was a nonjusticiable political question.  *Turner*, 269 N.W.2d at 829–31.  We emphasized that there had been no "showing of deprivation of substantial constitutional rights" as in *Luse*.  *Id.* at 832.

The plaintiffs seek to bring their claims under the umbrella of *Luse* rather than *Turner* by arguing they have made a showing of a deprivation of their own individual constitutional rights. We are not persuaded. Granted, the plaintiffs have spliced into their petition references to due process (article I, section 9) and unenumerated rights (article I, section 25).[6] But the substantive basis for their claims remains the public trust doctrine. That doctrine, by definition, involves rights that belong to the public as a whole. Pleading "public rights plus article I, section 9" or "public rights plus article I, section 25" doesn't alter the essential public-rights nature of the plaintiffs' lawsuit. *See Konrardy v. Vincent Angerer Tr., Dated March 27, 1998*, 925 N.W.2d 620, 623 n.1 (Iowa 2019) ("We look to the substance of Konrardy's and Burmeister's claim, not the label they attach, to determine its legal significance."); *State v. Webster*, 865 N.W.2d 223, 232 (Iowa 2015) ("[T]he substance of the claim, rather than its label, controls.").

Over a century ago, without using the term "political question," we applied something akin to that doctrine when we decided that courts did not have jurisdiction to review determinations by county boards of supervisors not to form drainage districts. *Denny v. Des Moines County*, 143 Iowa 466, 478, 121 N.W. 1066, 1071 (1909). We said that the sufficiency of a petition "in form or matter" to establish such a district was a proper subject for judicial review, but "the wisdom and practicability of a proposed drainage scheme" involved an exercise of "legislative authority" and district judges could only "determine judicial questions." *Id.* at 475, 121 N.W. at 1069–70. Therefore, even though the general assembly had

---

[6]The due process clause provides that "no person shall be deprived of life, liberty, or property, without due process of law." Iowa Const. art. I, § 9. The unenumerated rights clause provides, "This enumeration of rights shall not be construed to impair or deny others, retained by the people." *Id.* § 25.

conferred jurisdiction on district courts to consider such appeals, we affirmed the district court's dismissal of the action for want of jurisdiction. *Id.* at 471, 121 N.W. at 1067, 1071.  We said,

> In view of the express provision of our state Constitution that the powers of the government shall be divided into three separate departments, the legislative, the executive, and the judicial, and that no person charged with the exercise of powers properly belonging to one of these departments shall exercise any function appertaining to either of the others, except as in the Constitution expressly directed or permitted (Const. art. 3, § 1), it must be conceded that, if the authority vested in the board of supervisors is in its nature legislative, and not judicial, then the district court, which is only vested with judicial power (Const. art. 5, §§ 1, 6), cannot by statute be authorized to exercise such authority.

*Id.* at 471, 121 N.W. at 1068.  In other words, the pros and cons of a drainage district ultimately required the exercise of "legislative discretion," as opposed to being a question that could be resolved upon "issuable facts, capable of judicial determination."  *Id.* at 472, 121 N.W. at 1069.

More recently, we have approved of the six-part test quoted above to determine whether a case presents a nonjusticiable political question.  *See Besler*, 954 N.W.2d at 435; *King*, 818 N.W.2d at 17; *Dwyer*, 542 N.W.2d at 495, *Turner*, 269 N.W.2d at 831.  The test is drawn from a famous United States Supreme Court decision.  *See Baker v. Carr*, 369 U.S. 186, 210, 82 S. Ct. 691, 706 (1962).

As we have noted, the plaintiffs here seek to expand the traditional Iowa public trust doctrine.  Historically, this doctrine has been applied by our courts in cases seeking to remove private obstructions or interferences.  These types of disputes are susceptible to judicial resolution using principles of property law.  The plaintiffs allege, however, that the public trust doctrine "broadly protects the public's use of navigable waters."  In other words, the plaintiffs argue that the doctrine imposes a

duty on the State to pass laws that regulate those waters in the best interests of the public.

Under those circumstances, we perceive "a lack of judicially discoverable and manageable standards." *Besler*, 954 N.W.2d at 435 (quoting *King*, 818 N.W.2d at 17). In our view, stating that the legislature must "broadly protect[] the public's use of navigable waters" provides no meaningful standard at all. Different uses matter in different degrees to different people. How does one balance farming against swimming and kayaking? How should additional costs for farming be weighed against additional costs for drinking water? Even if courts were capable of deciding the correct *outcomes*, they would then have to decide *the best ways to get there*. Should incentives be used? What about taxes? Command-and-control policies? In sum, these matters are not "claims of *legal* right, resolvable according to *legal* principles, [but] political questions that must find their resolution elsewhere." *Rucho v. Common Cause*, \_\_\_ U.S. \_\_\_, \_\_\_, 139 S. Ct. 2484, 2494 (2019).

The suggestion is made that this court could simply tell our legislature to pass laws that would bring nitrate levels in the Raccoon River consistently below 10 mg/l. That's a specific outcome. But there are no judicially discoverable and manageable standards to aid a court in deciding whether that outcome is better than any other outcome. In *Rucho v. Common Cause*, for example, the plaintiffs and their amici proposed a variety of specific antigerrymandering rules. But how was a court to determine one was preferable to another?

Moreover, this case presents a much higher degree of complexity than *Rucho* because passing laws that will ultimately alter nitrogen and phosphorus content is far more challenging than adopting a redistricting map. As already noted, even if a court could decide that the public trust

doctrine mandated a particular outcome, the question would immediately arise how to get there.

In that regard, it seems impossible for a court to grant meaningful relief "without expressing a lack of the respect due coordinate branches of government." *See Besler*, 954 N.W.2d at 435 (quoting *King*, 818 N.W.2d at 17). Normally, in equity proceedings, courts issue orders that can be read and then implemented. This preserves the independence of other branches of government by limiting the degree and duration of judicial supervision. Here, by contrast, the plaintiffs ask for a judicial directive to the legislature "to adopt and implement a mandatory remedial plan to restore and protect public use that requires agricultural nonpoint sources and CAFO's [confined animal feeding operations] to implement nitrogen and phosphorus limitations in the Raccoon River watershed." Not only would this directive be aimed at the legislature, which in itself raises separation of powers concerns, but an indefinite number of policy choices that would then need to be made. Inevitably, the legislature would have to send its emissaries to 500 Mulberry Street or 1111 East Court Avenue in Des Moines. Proposals would be submitted to the judiciary on an ongoing basis for our approval or disapproval. In effect, the judiciary would be exercising a veto power over the legislature. At this point, we would cease to be a coequal branch of government. Instead, we'd be asserting superiority.

Another consideration is that the political branches in Iowa have made "an initial policy determination" to go in a different direction. *Id.* at 435 (quoting *King*, 818 N.W.2d at 17). As the petition alleges, the voluntary Iowa Nutrient Reduction Strategy that they seek to overturn has been enshrined in legislation enacted in 2013 and 2018. *See* 2018 Iowa Acts ch. 1001, § 20; 2013 Iowa Acts ch. 132, § 60. The federal EPA also

supports this approach.  To quote the 2011 Stoner Memorandum cited in the petition,

> EPA's focus for nonpoint runoff of nitrogen and phosphorus pollution is on promoting proven land stewardship practices that improve water quality.  EPA recognizes that the best approaches will entail States, federal agencies, conservation districts, private landowners and other stakeholders working collaboratively to develop watershed-scale plans that target the most effective practices to the acres that need it most.

Nancy Stoner, U.S. Envtl. Prot. Agency, *Working in Partnership with States to Address Phosphorus and Nitrogen Pollution Through Use of a Framework for State Nutrient Reduction* 3 (2011), https://www.acwa-us.org/wp-content/uploads/2017/04/The-Stoner-Memo.pdf [https://perma.cc/Z5Q5-U7FK].  The plaintiffs believe the existence of this longstanding, basic policy determination should not deter us because it provides a frame of reference for what the courts should *not* do.  We think this misconstrues the third political-question factor.  The third factor focuses not on timing, but on priority.  Is there a required policy determination that is more appropriate for another branch that sets the stage for everything else?  If so, courts should not get involved.  *Kanuk ex rel. Kanuk v. State, Dep't of Nat. Res.*, 335 P.3d 1088, 1098 (Alaska 2014) ("The underlying policy choices are not ours to make in the first instance.").

We recognize that this case may not involve a paradigm of "a textually demonstrable constitutional commitment of the issue to a coordinate political department." *Besler*, 954 N.W.2d at 435 (quoting *King*, 818 N.W.2d at 17).  But there should be no doubt that the plaintiffs are seeking additional state funding.  One paragraph of the petition alleges inadequate funding of the DNR.  Article III, section 24 provides, "No money shall be drawn from the treasury but in consequence of appropriations made by law."  This case, if it proceeds, would put the judiciary in the

position of commandeering additional state funding for intensive regulation of nitrogen and phosphorus in yet-to-be-determined ways.

Other cases support the conclusion that environmental public trust litigation is a nonjusticiable political question. In *Aji P. ex rel. Piper v. State,* the Washington Court of Appeals recently affirmed the dismissal on political question grounds of a lawsuit seeking to use the public trust doctrine to achieve the regulation of greenhouse gas emissions. 480 P.3d 438, 447–49 (Wash. Ct. App. 2021); *see also Kanuk,* 335 P.3d at 1090–91 (finding claims seeking specific relief based on the public trust doctrine to be barred by the political question doctrine and that other, more general claims should have been dismissed on prudential grounds); *Butler ex rel. Peshlakai v. Brewer,* 2013 WL 1091209, at *7 (Ariz. Ct. App. Mar. 13, 2013) (finding public trust claims nonjusticiable and noting "we would be weaving 'a jurisprudence out of air' to hold that the atmosphere is protected by the Doctrine and that state inaction is a breach of trust merely because it violates the Doctrine without pointing to a specific constitutional provision or other law that has been violated."); *Sanders-Reed ex rel. Sanders-Reed v. Martinez,* 350 P.3d 1221, 1227 (N.M. App. 2015) ("Separation of powers principles would be violated by adhering to Plaintiffs' request for a judicial decision that independently ignores and supplants the procedures established under the Air Quality Control Act. . . . We conclude that the courts cannot independently intervene to impose a common law public trust duty upon the State to regulate greenhouse gases in the atmosphere.").

The plaintiffs invoke *Environmental Law Foundation v. State Water Resources Control Board,* 237 Cal. Rptr. 3d 393 (Ct. App. 2018), but we think the case is distinguishable. The scope of the court's ruling in that case was "extraordinarily narrow." *Id.* at 396. The only issue was whether

a California agency and a county had to consider the potential harm from groundwater extraction on a navigable river before issuing well permits. *Id.* Pumping of groundwater has an effect on surface flows. *Id.* at 397. The court held that the public trust doctrine applied to such removals of nonnavigable water that had an adverse effect on navigable water. *Id.* at 402. Significantly, the case involved a single question of administrative law, and the California version of the public trust doctrine "is expansive." *Id.* at 400. But our present case does not involve a discrete attempt to modify an administrative process to insure that the consideration of arguments against diverting water that would otherwise go into a public trust navigable river. Instead, it seeks to order the legislature to enact a new set of environmental laws that balance the competing interests of stakeholders in different ways than before.

Finally, we believe we should draw lessons from Oregon's experience. In 2011, two young Oregonians brought a suit against the State of Oregon under the public trust doctrine, seeking to protect its natural resources from the effects of greenhouse gas emissions. *Chernaik v. Brown*, 475 P.3d 68, 71–72 (Or. 2020). Specifically, the plaintiffs sought a declaratory judgment and an injunction directing the state to implement a carbon reduction plan under court supervision. *Id.* Initially, the trial court dismissed the plaintiffs' claims partly because they presented political questions. *Id.* at 72. The Oregon Court of Appeals reversed and remanded. *Id.* Eventually, after years of litigation, the case reached the Oregon Supreme Court, which ruled that the plaintiffs were not entitled to any relief except for a symbolic declaration that the public trust doctrine applies to navigable waters and submerged and submersible lands. *Id.* at 82. That was the anticlimactic end to nearly a decade of litigation.

We can do better. Where the plaintiffs have put forth claims that we cannot meaningfully resolve *as a court using accepted methods of judicial decisionmaking,* we should invoke the political question doctrine. We do so here and leave this dispute where it stands at present: with the branches of our government whose duty it is to represent *the public.* In the end, we believe it would exceed our institutional role to "hold the State accountable to the public." Those words, used by the plaintiffs to describe what they ask of us, go beyond the accepted role of courts and would entangle us in overseeing the political branches of government.[7]

## IV. Conclusion.

For the foregoing reasons, we reverse the district court's order and remand with instructions to dismiss this case based on lack of standing and nonjusticiability.

**REVERSED AND REMANDED.**

Christensen, C.J., and Waterman and McDermott, JJ., join this opinion. Appel, J., files a dissenting opinion. McDonald, J., files a dissenting opinion, which Oxley, J., joins. Oxley, J., files a dissenting opinion, which Appel, J., joins.

---

[7]Lest we be misunderstood, we agree that the petition describes a real environmental problem, both in Iowa and nationally. In their petition, the plaintiffs discuss the hypoxic zone in the Gulf of Mexico and the 2008 Gulf Hypoxia Plan. As further noted in the petition, the EPA declined in 2011 to take national action and a lawsuit seeking to reverse that decision failed. *See Gulf Action Network v. Jackson,* 224 F. Supp. 3d 470, 474–75 (E.D. La. 2016). But we are a court, and we would be stepping outside our role to take on this matter as presented to us by these plaintiffs.

#19–1644, *Iowa Citizens for Cmty. Improvement v. State*

**APPEL, Justice (dissenting).**

In *Lujan v. Defenders of Wildlife*, Justice Harry Blackmun wrote, "I cannot join the Court on what amounts to a slash-and-burn expedition through the law of environmental standing." 504 U.S. 555, 606, 112 S. Ct. 2130, 2160 (1992) (Blackmun, J., dissenting). In short, *Lujan* is precisely the kind of case where we should heed recent admonitions to not simply adopt federal caselaw in a top-down constitutional world. *See* Jeffrey S. Sutton, *51 Imperfect Solutions: States and the Making of American Constitutional Law* 20 (2018). The majority, however, chooses to bring what Justice Blackmun called "slash-and-burn" to Iowa when reviewing a motion to dismiss a suit alleging injury in violation of the public trust doctrine.

I dissent. For starters, I would follow the approach of our state court colleagues in Colorado, Connecticut, Hawaii, Nevada, Oregon, and Washington[8] and refuse to erect the barriers to access to the courts which were developed in a conference room in Washington, D.C., over the bitter protest of a minority of the Supreme Court. *See* Wyatt Sassman, *A Survey of Constitutional Standing in State Courts*, 8 Ky. J. Equine, Agric., & Nat'l Res. L. 349, 349 (2016) (noting that only a minority of states adopt the test adopted in *Lujan*). In particular, I would refuse to allow a handwringing application of standing doctrine to throttle environmental litigation in a motion to dismiss an action for declaratory and injunctive relief based on

---

[8]*See, e.g.*, *City of Greenwood Village v. Petitioners for Proposed City of Centennial*, 3 P.3d 427, 437 n.8 (Colo. 2000) (en banc); *Andross v. Town of West Hartford*, 939 A.2d 1146, 1157–59 (Conn. 2008); *Citizens for Prot. of N. Kohala Coastline v. County. of Hawaiʻi,*, 979 P.2d 1120, 1127 (Haw. 1999); *Stockmeier v. Nev. Dep't of Corr. Psych. Rev. Panel*, 135 P.3d 220, 225–26 (Nev. 2006) (per curiam), *abrogated on other grounds by Buzz Stew, LLC v. City of North Las Vegas*, 181 P.3d 670 (Nev. 2008); *Kellas v. Dep't of Corr.*, 145 P.3d 139, 143 (Or. 2006); *West v. Seattle Port Comm'n*, 380 P.3d 82, 86 (Wash. Ct. App. 2016).

the innovative discovery and application in *Lujan* of "causation" or "redressability" requirements. 504 U.S. at 560–61, 112 S. Ct. at 2136.

I have already canvassed the law of standing in my dissent in *Dickey v. Iowa Ethics & Campaign Disclosure Board.* 943 N.W.2d 34, 42–57 (Iowa 2020) (Appel, J., dissenting). By way of brief summary, the federal courts are restricted by the "case or controversy" requirements of Article III of the United States Constitution. *Id.* at 42. The limitations in Article III are based, in part, on considerations of federalism; namely, keeping federal courts out of state business. *See id.* But in this case, of course, there are no federalism considerations. We are a state court dealing with the state's business. And our state constitutional framers deliberately omitted the language of Article III from the state constitution. *See id.* at 43. Unlike the federal courts of limited jurisdiction, general jurisdiction state courts were designed to be problem-solving courts with sufficient judicial power to effectively resolve a wide range of disputes brought to the local courthouse by citizens. *Id.* at 42.

As a result, in Iowa, we have correctly held that "the federal test for standing is based in part upon constitutional strictures and prudential considerations while our rule on standing is self-imposed." *Alons v. Iowa Dist. Ct.*, 698 N.W.2d 858, 869 (Iowa 2005). There is no requirement for us to blindly follow federal precedent in standing or any other area of law. And I have no interest in closing down access to the courts with the "gotcha" applications of "redressability" and "causation" announced in *Lujan* and inconsistently applied thereafter, particularly when the newly discovered elements of standing are astonishingly applied at the motion to dismiss stage of litigation to dismiss cases involving important state constitutional issues. *See, e.g.*, William A. Fletcher, *Standing: Who Can Sue to Enforce a Legal Duty?*, 65 Ala. L. Rev. 277, 286–87 (2013) ("The

environmental [standing] cases also respond to the Court's perception of political reality. . . . [The Supreme Court] is narrowly construing statutes with whose policies it disagrees, using a standing doctrine that it has developed for this purpose."); Oliver A. Houck, *Arbitrary and Capricious: The Dark Canon of the United States Supreme Court in Environmental Law*, 33 Geo. Env't L. Rev. 51, 70 (describing *Lujan* as "The Weaponization of Standing"); Cass R. Sunstein, *Standing and the Privitization of Public Law*, 88 Colum. L. Rev. 1432, 1480 (1988) (stating that the court's standing doctrine arises not from "restraint in the abstract but instead from hostility to suits brought by beneficiaries of regulatory programs to ensure fidelity to statute").

Although we have cited *Lujan* in a few cases on occasion, up until now, we have not adopted its new and innovative elements of "causation" and "redressability" into our standing doctrine. In *Alons v. Iowa District Court*, we cited *Lujan* for the traditional "injury in fact" federal standing requirement. 698 N.W.2d at 867–68. In *Sanchez v. State*, we cited *Lujan* for the traditional requirement of "injury in fact" again but the newly fashioned "causation" and "redressability" additions of *Lujan* were not part of the holding of the Iowa case. 692 N.W.2d 812, 821 (Iowa 2005). Notably, no party in these cases cited *Lujan* in their briefs, let alone urged adoption of the "causation" or "redressability" discoveries of the case. Indeed, there is no Iowa case citing *Lujan* where the question of whether we should import into Iowa law its newly developed standing criteria on "causation" or "redressability." But once a federal case is casually cut and pasted into the Iowa law books in an uncontested setting, it has a tendency, particularly if the federal case is rights restricting, to germinate into accidental precedent.

Here is the bottom line. We should not adopt the access to the courts restrictions of *Lujan.* We don't need them. Our public trust cases have adhered to traditional standing doctrine. In *Bushby v. Washington County Conservation Board*, the court considered standing in a public trust and environment claim. 654 N.W.2d 494, 496–97 (Iowa 2002). The *Bushby* court required the plaintiffs to show the traditional elements of "(1) a specific, personal, and legal interest in the litigation, and (2) injury." *Id.* at 496 (quoting *Rieff v. Evans*, 630 N.W.2d 278, 284 (Iowa 2001) (en banc)). More recently, in *Puntenney v. Iowa Utilities Board*, we held that a nonprofit environmental organization had standing to challenge the approval of an oil pipeline and the use of eminent domain under the *Bushby* standard. 928 N.W.2d 829, 837 (Iowa 2019). No mention of *Lujan.* We should follow the *Bushby* standard here.

In any event, at the pleading stage, it is clear that the plaintiffs have alleged causation and redressability sufficient to survive a motion to dismiss even under *Lujan.* The plaintiffs attack the failure of the state to regulate agricultural nitrogen and phosphorus that enters the Raccoon River and substantially impairs the waterway. This allegation certainly satisfies the innovative "causation" element of *Lujan.* Further, as for the newly discovered "redressability requirement" that the State seeks to import into state law, the plaintiffs do not need to show that the requested relief will solve the problem completely but only that it will do some good. *Pub. Int. Rsch. Grp. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 73 (3d Cir. 1990). And, though it apparently may not matter, the State concedes the presence of injury in fact and the traditional elements of standing.

I now turn to the majority's discussion of the scope of the public trust doctrine. The majority provides a couple of pages that the average reader would likely conclude advance a narrow construction of the public

trust doctrine. The issue was not briefed by the parties and is not before the court. One could respond, I suppose, by noting the very generous language in *State v. Sorenson*, 436 N.W.2d 358, 363 (Iowa 1989), which stated that although we do not necessarily subscribe to the broad application of the doctrine, "the public trust doctrine . . . applies broadly to the public's use of property, such as waterways, without ironclad parameters on the types of uses to be protected." (Emphasis omitted.)

I do not join the majority's essay on the question or any of its narrow pronouncements oddly made in a case where a party has conceded, for purposes of a motion to dismiss, that the scope of the public trust doctrine is not at issue. I do note, however, from my review of cases that the public trust doctrine is not the proverbial legal fly frozen in amber. *See Marks v. Whitney*, 491 P.2d 374, 380 (Cal. 1971) (en banc) ("In administering the trust the state is not burdened with an outmoded classification favoring one mode of utilization over another."); *In re Water Use Permit Applications*, 9 P.3d 409, 450 (Haw. 2000) (declaring that purposes or uses of the public trust doctrine have "evolved over time"); *Matthews v. Bay Head Improvement Ass'n*, 471 A.2d 355, 365 (N.J. 1984) (declaring public trust doctrine is not " 'fixed or static,' but one to 'be molded and extended to meet changing conditions and needs of the public it was created to benefit.' " (quoting *Borough of Neptune City v. Borough of Avon-By-The-Sea*, 294 A.2d 47, 55 (N.J. 1972))). And, beginning with the seminal article of Professor Sax in the Michigan Law Review fifty years ago, there is now a rich literature on the public trust doctrine that collect cases and provide rich insight into the questions of content and scope of the doctrine in the modern age. *See* Joseph Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention*, 68 Mich. L. Rev. 471 (1970). *See generally* Michael C. Blumm & Mary Christina Wood, *"No Ordinary*

*Lawsuit,": Climate Change, Due Process, and the Public Trust Doctrine*, 67 Am. U. L. Rev. 1 (2017); Harrison C. Dunning, *The Public Trust: A Fundamental Doctrine of American Property Law,* 19 Env't L. 515 (1989); Gerald Torres & Nathan Bellinger, *The Public Trust Doctrine: The Law's DNA,* 4 Wake Forest J.L. & Pol'y 281 (2014). But conservative scholars and others want to petrify or at least embalm the public trust doctrine. *See* James L. Huffman, *Why Liberating the Public Trust Doctrine is Bad for the Public,* 45 Env't Law 337 (2015).

Ordinarily, courts do not develop doctrine on uncontested issues, and ordinarily I would not opine on them. However, if pushed into a corner by a majority that insists on proceeding to develop the contours of the public trust doctrine notwithstanding the State's concession, I would declare that the public trust doctrine applies to pollution of navigable waterways in a fashion that prevents or significantly impairs recreational activities and the use of water for drinking purposes. *See Nat'l Audubon Soc'y v. Superior Ct.,* 658 P.2d 709, 712 (Cal. 1983) (applying public trust doctrine in environmental setting); *In re Water Use Permit Applications,* 9 P.3d at 447 (holding that public trust applies to ground water and surface water); *Lamprey v. Metcalf,* 53 N.W. 1139, 1143 (Minn. 1893) (noting that public trust doctrine applies to use of waterways "and other public purposes which cannot now be enumerated or even anticipated"); Ralph W. Johnson, *Water Pollution and the Public Trust Doctrine,* 19 Env't Law 485, 493–98 (1989).

In addition to these observations, I join in the dissent of Justice Oxley regarding the premature nature of the majority's decision. I also incorporate my dissent in *State ex rel. Dickey v. Besler*, which is dispositive on the political question issue posed in this case. 954 N.W.2d 425, 439–49 (Iowa 2021) (Appel, J., dissenting).

For the above reasons, I dissent.

#19–1644, *ICCI, et al. v. State, et al.*

**McDONALD, Justice (dissenting).**

The public trust doctrine is of long standing. The "doctrine is said to be traceable to the work of Emperor Justinian, based on the notion that the public possesses inviolable rights to certain natural resources." *State v. Sorensen*, 436 N.W.2d 358, 361 (Iowa 1989). "The doctrine was adopted into the English common law and embraced by nineteenth century American jurists." *Id.* Under the doctrine, "the interest of state government in public trust land is, in a sense, only that of a steward." *Id.* This stewardship is "a burden, rather than a benefit." *Id.* Historically, the public trust doctrine "has [had] a narrow scope." *Fencl v. City of Harpers Ferry*, 620 N.W.2d 808, 813 (Iowa 2000) (en banc). As the majority correctly notes, the doctrine has been limited to protecting the public's access to public waters and to preventing the state from alienating lands held in the public trust. *See Larman v. State*, 552 N.W.2d 158, 161 (Iowa 1996). It is not disputed that private citizens have standing to sue for violations of the public trust doctrine, as traditionally understood. *See, e.g.*, *Bushby v. Wash. Cnty. Conservation Bd.*, 654 N.W.2d 494, 497 (Iowa 2002) (holding private citizens had standing under the public trust doctrine and resolving the case on the merits); *Witke v. State Conservation Comm'n*, 244 Iowa 261, 271–72, 56 N.W.2d 582, 588–89 (1953) (reaching merits of the claim and stating "the state may not restrict or charge for the use of the waters of navigable streams or lakes, and an attempt on its part to do so is a deprivation of the citizen of his property without due process of law, and without compensation, and so in violation of Sections 9 and 18 of Article I of the Constitution of Iowa").

In this case, the plaintiffs seek to channel the traditional understanding of the public trust doctrine in a new direction. They claim

the doctrine imposes upon the State, as steward of lands held in the public trust, an affirmative obligation to protect the public use of navigable waters and to prevent the substantial impairment of navigable waters. They further claim the State has violated this affirmative duty by allowing nitrogen and phosphorous discharges from agricultural sources to impair the recreational and drinking water uses of the meandered section of the Raccoon River. The plaintiffs claim the State's failure to act under these circumstances constitutes a violation of the public trust doctrine and constitutes a taking of their constitutionally-protected property interest in public lands. *See, e.g., Witke*, 244 Iowa at 272, 56 N.W.2d at 589 (holding the state's restriction of access to navigable streams or lakes "is a deprivation of the citizen of his property without due process of law").

Whether the public trust doctrine can be channeled in this new direction is not properly before this court. In navigating this case, the State, for whatever reason, chose to not challenge the merits of the plaintiffs' claims in the district court or on appeal. The Solicitor General made this clear during oral argument, stating, "Let me be clear that—that these issues about the public trust doctrine are specifically not before the court right now." Thus, for the purposes of resolving this appeal involving only the standing doctrine and the political questions doctrine, we must assume the public trust doctrine is as broad as the plaintiffs claim.

The State's decision to forego any substantive challenge to the merits of the plaintiffs' claims, in my view, largely resolves this appeal. If private citizens have standing to sue for violations of the public trust doctrine as traditionally understood, *see Witke*, 244 Iowa at 272, 56 N.W.2d at 589, it stands to reason the same private citizens have standing to sue for violations of the public trust doctrine as they seek to expand it. At minimum, the plaintiffs have standing to pursue declaratory relief. The

Solicitor General conceded this during oral argument: "I will have to concede that when we talk about redressability and causal connection to the injury . . . I think I'd have to concede you could get to, if you wanted to, a declaratory order of some sort . . . ." In the procedural posture presented, on this record, I agree with the Solicitor General that, at minimum, the plaintiffs have sufficient standing to pursue some form of limited relief.

The majority raises a host of legitimate concerns regarding the constitutionality, feasibility, and efficacy of potential remedies. I share those concerns. And, perhaps, those concerns militate against expansion of the public trust doctrine. But, for now, this case is at the headwaters. The State has conceded, for now, the public trust doctrine goes as far as the plaintiffs contend. In the procedural posture presented, the plaintiffs have thus asserted a cognizable legal claim. "[A] plaintiff . . . has what we have come to call 'standing,' whenever he has a legally cognizable cause of action, regardless of whether he can show a separate, stand-alone factual injury." *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1115 (11th Cir. 2021) (Newsom, J., concurring); *id.* at 1131 ("The question whether a plaintiff has 'standing' really just boils down to the question of whether he has a cause of action—whether his legal rights have been infringed and whether the positive law authorizes him to sue for that infringement."). The State has conceded, for now, the plaintiffs at least have standing to pursue some limited relief under an expanded public trust doctrine. What relief exactly—and the constitutionality, feasibility, and efficacy of that relief—are best worked out in the district court on a better record and with fuller briefing.

For these reasons, I would affirm the judgment of the district court, remand this matter, and allow the case to continue downstream. I respectfully dissent.

Oxley, J., joins this dissent.

#19–1644, *ICCI, et al. v. State, et al.*

**OXLEY, Justice, (dissenting).**

Ours is an adversarial system, and the court's role is to decide the issues as presented by the parties.[9]  Yet the State has put us between the proverbial rock and a hard place by insisting it is not challenging the scope of the public trust doctrine, its imposition of affirmative obligations on the State, or its constitutional underpinnings.  Protestations notwithstanding, the majority necessarily decides those issues in concluding the plaintiffs lack standing and raise only nonjusticiable political questions.  While I share the majority's doubt as to how far the plaintiffs can ride their public trust doctrine horse, expediency is not a basis for dismissing cases.  Given the posture of this appeal, I respectfully dissent.

The plaintiffs assert that the constitutionally-based public trust doctrine protects their right to use the Raccoon River for recreation and drinking water purposes; those uses are being harmed by pollution in the river, specifically harmful levels of nitrates that exceed acceptable levels identified by legislative and executive bodies; the State has an affirmative obligation to protect the plaintiffs' rights against that pollution; and the State has failed to meet those affirmative obligations where it relies only on voluntary compliance efforts to convince agricultural nonpoint sources to reduce the amounts of nitrogen and phosphorus used as fertilizer that make their way into the river.  The plaintiffs seek a declaration of their constitutional rights, the State's obligations to protect those rights, and whether the State has breached those obligations.  The plaintiffs also seek

---

[9]*See State v. Struve*, 956 N.W.2d 90, 99 n.2 (Iowa 2021) ("[O]ur system 'is designed around the premise that [parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief.' " (alteration in original) (quoting *United States v. Sineneng-Smith*, 590 U.S. ___, ___, 140 S. Ct. 1575, 1579 (2020))).

a declaration that the State's adoption of the voluntary strategy as the official policy of the State for addressing nitrate levels in navigable waters violates the State's obligations under the doctrine and an injunction requiring state officials to take action to reduce nitrate levels.

Despite its origins related to navigation and commerce, we have expanded the public trust doctrine "to safeguard the public's use of navigable waters for purely recreational and non-pecuniary purposes." *Robert's River Rides, Inc. v. Steamboat Dev. Corp.*, 520 N.W.2d 294, 299 (Iowa 1994), *abrogated on other grounds by Barreca v. Nickolas*, 683 N.W.2d 111, 121 (Iowa 2004); *see also State v. Pettijohn*, 899 N.W.2d 1, 35 (Iowa 2017) (describing recreational use of navigable waters as a " 'paramount' right" under the public trust doctrine); *McCauley v. Salmon*, 234 Iowa 1020, 1022, 14 N.W.2d 715, 716 (1944) ("The right of the public to navigate the water is paramount. This includes the right of fishing, boating, skating and other sports." (citations omitted)). And we have allowed private citizens to assert rights under the doctrine. *See, e.g.*, *Bushby v. Wash. Cnty. Conservation Bd.*, 654 N.W.2d 494, 496–97 (Iowa 2002); *Witke v. State Conservation Comm'n*, 244 Iowa 261, 263–64, 56 N.W.2d 582, 584–85 (1953). Here, the plaintiffs seek to extend the doctrine to impose an obligation on the State to protect navigable waters from effective alienation through pollution. And, critical to our resolution of the specific issues before us, the State accepts the plaintiffs' position as an acceptable extension of the public trust doctrine.

The majority makes a principled argument that the public trust doctrine does not impose such affirmative obligations on the State and that even if it did, the doctrine does not provide private parties with a cause of action to enforce any such affirmative obligations. The problem is that the parties do not address the scope of the public trust doctrine or whether

it provides a cause of action for the plaintiffs. Indeed, the State insists its position assumes the doctrine applies as broadly as the plaintiffs assert. As Justice McDonald points out, the Solicitor General reinforced its position during oral argument. The State, as part of its litigation strategy, made a decision to not challenge the merits of the public trust doctrine as articulated by the plaintiffs. Thus, for the purposes of resolving this motion to dismiss, we must assume the public trust doctrine is as broad as the plaintiffs claim.

The majority refuses to do that. That the majority has decided the merits of the public trust issue is best seen in its discussion of the political question doctrine, explaining it is "not persuaded" that the plaintiffs have made a showing of a deprivation of their own individual constitutional rights, thereby distinguishing *Luse v. Wray*, 254 N.W.2d 324, 327–28 (Iowa 1977) (en banc). The majority must do so because "the judiciary's power to interpret the constitution and to review the constitutionality of the laws and acts of the legislature does not offend [political question] principles." *King v. State*, 818 N.W.2d 1, 17 (Iowa 2012) (citing *Luse*, 254 N.W.2d at 327–28 and *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177–78 (1803)). Rather, "it is a matter for the judiciary to pass upon the constitutionality of the official and specific acts of the other departments of government." *Luse*, 254 N.W.2d at 327 (quoting 16 C.J.S. *Constitutional Law* § 144, at 688). This principle holds true in the context of asserted violations of the public trust doctrine. *See, e.g.*, *Kanuk ex rel. Kanuk v. State, Dep't of Nat. Res.*, 335 P.3d 1088, 1099 (Alaska 2014) (explaining that "[t]he *Baker* factors for identifying non-justiciable issues do not apply to judicial interpretations of the constitution" and holding a request for declaratory judgment that the atmosphere is part of the public trust, that the state has an affirmative obligation to protect and preserve it, and that the state

failed to uphold its fiduciary obligations did not present political questions); *Butler ex rel. Peshlakai v. Brewer*, No. 1 CA–CV 12–0347, 2013 WL 1091209, at *5 (Ariz. Ct. App. Mar. 14, 2013) ("Not only is it within the power of the judiciary to determine the threshold question of whether a particular resource is a part of the public trust subject to the Doctrine, but the courts must also determine whether based on the facts there has been a breach of the trust."); *Chernaik v. Kitzhaber*, 328 P.3d 799, 804–08 (Or. Ct. App. 2014) (holding a request for declaratory judgment on whether the atmosphere is subject to the public trust doctrine is justiciable and remanding to the trial court to make that determination in the first instance)[10].

In *King v. State*, we addressed whether the plaintiffs' attempts to judicially impose state-mandated public school education standards as a means of protecting their claimed constitutional rights were nonjusticiable only after first determining that the plaintiffs failed to state claims for relief under the education clauses of the Iowa Constitution. *See* 818 N.W.2d at 16. As we explained, "the political question grounds and the failure to state a claim grounds are interrelated." *Id.* at 12. There, unlike here, the defendants had argued to the district court that the plaintiffs'

---

[10]The majority's insistence we "can do better" than Oregon in its decade-long litigation that resulted in the less-than-satisfying "symbolic" declaration of the extent of the public trust doctrine's scope, *see Chernaik v. Brown*, 475 P.3d 68, 71–72 (Or. 2020), not only places the majority in the adversary's role but also ignores critical distinctions between the greenhouse gas emission cases attempting to extend the public trust doctrine to cover the atmosphere cited by the majority and the already-established protections for recreational use of navigable water involved here. *Cf. Kanuk*, 335 P.3d at 1103 (distinguishing between requests to extend public trust doctrine to cover atmosphere as a natural resource and claims premised on detrimental impacts on "already-recognized public trust resources such as water, shorelines, wildlife, and fish"). Despite the majority's apparent skepticism of the plaintiffs' position, we must also accept the detailed pleaded facts as true for purposes of reviewing the defendants' motion to dismiss. *See Hawkeye Foodservice Distrib., Inc. v. Iowa Educators Corp.*, 812 N.W.2d 600, 604 (Iowa 2012).

constitutional claims failed as a matter of law, which allowed us to address the contours of the constitutional claims on appeal. *Id.* at 11.

Faced with this dilemma, the majority effectively holds the plaintiffs lack a private cause of action because "the substantive basis for their claims remains the public rights[11] doctrine," which "by definition, involves rights that belong to the public as a whole." Despite no briefing or argument by the parties, the majority has eviscerated any claim that the public trust doctrine provides a private cause of action for private citizens. And if holding no cause of action exists is not addressing the merits of the plaintiffs' claims, it is hard to imagine what would be.

We have never held that the public trust doctrine cannot serve as the basis of individual constitutional rights. We have, however, held that plaintiffs seeking to extend the public trust doctrine to natural resources other than navigable waters had standing to challenge a conservation board's plans to cut down trees in a public park, ultimately concluding nonetheless that the doctrine did not extend to management of forested areas. *See Bushby*, 654 N.W.2d at 496–98.

In *White Bear Lake Restoration Ass'n ex rel. State v. Minnesota Department of Natural Resources*, the Minnesota Supreme Court started by addressing the scope of its public trust doctrine, concluding it was "not inclined to extend the public trust doctrine" to cover the plaintiffs' claims before then discussing the heavy regulation of the field of public water as supporting the decision not to extend the common law absent a compelling reason to do so. *See* 946 N.W.2d 373, 386–87 (Minn. 2020). Given the

---

[11]The majority's reference to the "public rights doctrine," something different than the public trust doctrine, does not make its analysis any less dependent on the merits of the plaintiffs' claim. A doctrine not discussed by the parties, we have never used the public rights doctrine to deny a citizen the right to hold the state to its obligations under the public trust doctrine not to alienate the public's rights to access and use navigable waters.

structure put in place to balance the various priorities involved, and the fact that the plaintiffs had not alleged any private encroachment, the court saw "no need to extend the judiciary's common-law role *in this instance.*" *Id.* at 386 (emphasis added). That court's discussion of the heavily-regulated field of water rights weighed into the issue of whether to recognize a new cause of action; it did not preclude the judiciary's consideration of the cause of action altogether. Notably, other states have recognized "[p]reventing pollution and protecting the quality of the waters of the state . . . as being part of the state's affirmative duty under the 'public trust' doctrine." *Wis. Env't Decade, Inc. v. Dep't of Nat. Res.*, 271 N.W.2d 69, 76 (Wis. 1978); *see also* Ralph W. Johnson, *Water Pollution and the Public Trust Doctrine*, 19 Env't L. 485, 488 & n.13 (1989) ("[I]n recent years, courts have increasingly identified water quality as a separate or specific, rather than derivative, interest protected by the public trust doctrine." (citing *Nat'l Audubon Soc'y v. Superior Ct.*, 658 P.2d 709 (Cal. 1983))).

We engaged in a similar analysis in *Bushby v. Washington County Conservation Board*, 654 N.W.2d 494. Contrary to the majority's characterization of *Bushby,* we did not reject the plaintiffs' claim because the county supervisors were entitled to deference. Rather, we first determined that the public trust doctrine, which had originally applied to beds of navigable waters and had been expanded to include recreational use of lakes and rivers, should not be extended to apply to management of forested areas of public lands. *Id.* at 497–98. That expansion would have gone well beyond the navigable water baseline (one might say the doctrine's high water mark) that undergirds our understanding of the public trust doctrine, even as we have expanded its scope within the confines of navigable waters. *See id.* It was only after determining the

limits of the doctrine that we then concluded it could not serve as an impediment to a public body's otherwise lawful management of public lands. *Id.* *Bushby* establishes that the scope of the public trust doctrine determines whether it could serve as a limit on the management of certain natural resources, which necessarily requires a determination of whether the doctrine applies to the particular controversy at issue. If it does, then, like any other constitutionally protected right, this court has the ability, indeed the responsibility, to determine if the state's actions have violated those rights.

The majority uses this same reasoning from *White Bear* and *Bushby* but repackages it—purportedly without first deciding the merits of the public trust doctrine—to support its assertion that the plaintiffs' requested declaratory and injunctive relief is too speculative by encroaching on the legislative and executive branches' balancing of uses for water in the Raccoon River between farmers' economic interests and the plaintiffs' interests, surmising the plaintiffs' requested relief could ultimately lead to even higher out-of-pocket expenditures for the plaintiffs' members. While giving lip service to the doctrinal notion that "standing does not depend on the legal merits of a claim," *Godfrey v. State*, 752 N.W.2d 413, 420 (Iowa 2008), the majority necessarily addresses the merits by basing its standing holding on the premise that the public trust doctrine does not provide the protections the plaintiffs allege. In concluding we can offer no remedy, the majority has necessarily decided the doctrine does not extend to the plaintiffs' claims.

One more point from *White Bear*. Unlike the plaintiffs in *White Bear*, who did "not allege that the DNR has violated its duty as trustee to protect public use from 'private interruption and encroachment,' [a] core rationale of the [public trust] doctrine," 946 N.W.2d at 386, here, the plaintiffs *do*

allege that the State defendants violated their duty as trustee to protect public use of the Raccoon River from pollution caused by private parties, parties currently being regulated by the defendants. But the State's litigation strategy not to challenge whether the plaintiffs have stated a claim in its motion to dismiss prevents us from reaching the merits of the plaintiffs' public trust claim. Believing the case is doomed anyway, and attempting to "do better" than embroil our courts in a decades-long battle that will result in, at best, lackluster results for the plaintiffs, the majority short circuits the process based on its ultimate view of the case to order dismissal for lack of standing and the existence of nonjusticiable political questions.

Given the entanglement between "the political question grounds and the failure to state a claim grounds," *King*, 818 N.W.2d at 12, the State insisting it is not challenging the merits or constitutional underpinnings of the public trust doctrine precludes its justiciability argument. *See Luse*, 254 N.W.2d at 327–28 ("Iowa courts have power to adjudicate substantial claims of deprivation of federal or Iowa constitutional rights . . . .").[12]

With respect to standing, I believe the plaintiffs' request for a declaration of their rights and the State's obligations meets the redressability threshold, assuming redressability applies as the majority insists. *See Kanuk*, 335 P.3d at 1095 (rejecting redressability argument, explaining: "Assuming the existence of a fiduciary duty on the part of the State to protect a public resource, the duty would not seem to depend on

---

[12]The majority dismisses the plaintiffs' request for a declaration of their constitutional rights on the basis that *State ex rel. Dickey v. Besler*, 954 N.W.2d 425 (Iowa 2021), too, involved constitutional issues, and that did not stop us from finding the claim to present a political question. But *Besler* involved a quo warranto action where a private citizen, Gary Dickey, challenged the public office held by another even though Dickey had no claim to the office. *See id.* at 430–31, 433–34. This is not just a case involving constitutional issues, but a claim that the State is violating the plaintiffs' rights under the constitution.

the source of the threatened harm"). We have never shied away from declaring rights of beneficiaries and obligations of trustees. *See, e.g.*, *In re Steinberg Fam. Living Tr.*, 894 N.W.2d 463, 468 (Iowa 2017) (considering a declaratory judgment action to interpret a trust). And courts around the country recognize the importance of the judiciary's role in defining the scope and applicability of the public trust doctrine. "Just as private trustees are judicially accountable to their beneficiaries for dispositions of the res, so the legislative and executive branches are judicially accountable for their dispositions of the public trust." *Ariz. Ctr. For L. In Pub. Int. v. Hassell*, 837 P.2d 158, 169 (Ariz. Ct. App. 1991) (citation omitted) ("The check and balance of judicial review provides a level of protection against improvident dissipation of an irreplaceable res."); *see also Kootenai Env't All., Inc. v. Panhandle Yacht Club, Inc.*, 671 P.2d 1085, 1092 (Idaho 1983) ("Final determination whether the alienation or impairment of a public trust resource violates the public trust doctrine will be made by the judiciary. . . . [T]his court will take a 'close look' at the action to determine if it complies with the public trust doctrine and it will not act merely as a rubber stamp for agency or legislative action."); *Op. of the Justs.*, 437 A.2d 597, 607 (Me. 1981) (applying "a high and demanding standard of reasonableness" to judicial review of legislative action releasing state's ownership of submerged and intertidal lands that were subsequently filled for compliance with the Legislative Powers Clause). As Justice McDonald also points out, the Solicitor General conceded at oral argument that the plaintiffs would have standing to pursue, at minimum, their claims for declaratory relief.

Against this authority and the State's concession, the majority's dismissive characterization of the plaintiffs' requested declaratory relief as too general rings hollow. It is not enough to say that protecting against

pollution is not alienating or limiting access to navigable waters; that would be addressing the merits of the plaintiffs' claims.

With respect to the plaintiffs' requested injunctive relief, the State is currently regulating the third-party nonpoint sources allegedly causing the nitrate pollution, but, according to the plaintiffs, they are doing so ineffectively through a voluntary compliance strategy. If a court struck the legislatively mandated adoption of the voluntary-based strategy as a violation of the public trust doctrine while also declaring the State has a constitutional obligation to manage pollution in the Raccoon River, removal of the statute would free state agencies to regulate storm runoff through a mandatory regime as requested by the plaintiffs. For purposes of a motion to dismiss, we "assume[] that the state will act in accordance with a judicially issued declaration regarding the scope of any duties that the state may have under the public trust doctrine." *Chernaik*, 328 P.3d at 807; *cf. Butler ex rel. Peshlakai*, 2013 WL 1091209, at *6–8 (recognizing scope and enforcement of public trust doctrine is within court's power to adjudicate but dismissing declaratory judgment claim challenging state agency's failure to regulate greenhouse gas emissions for lack of a remedy where plaintiff failed to challenge constitutionality of the statute preventing state agencies from doing so absent express legislative authorization, similar to section 20 of Senate File 512 challenged here). The plaintiffs' requested declaratory and injunctive relief, if granted, would provide sufficient redressability for the plaintiffs' claimed injuries to meet constitutional standards.

The State's insistence that, for purposes of its motion to dismiss, the public trust doctrine grants the rights and imposes the obligations asserted by the plaintiffs requires us to affirm the district court's denial of the State's motion to dismiss and allow the case to proceed.

I therefore respectfully dissent.

Appel, J., joins this dissent.